Docket No. 98965–Agenda 8–September 2005.
THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
MARCEL NICHOLAS, Appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

The defendant, Marcel Nicholas, was questioned and later arrested in connection with the shooting death of his mother outside their apartment. The defendant made a court-reported inculpatory statement 35 hours after his arrest. He was presented to the trial court for a probable cause hearing five hours later, 40 hours after his arrest.

A jury convicted the defendant of first degree murder, and the circuit court of Cook County sentenced him to 35 years' imprisonment. The appellate court reversed his conviction and sentence, holding in part that the delay between the defendant's arrest and presentment violated the fourth amendment and, consequently, that the defendant's court-reported inculpatory statement was inadmissible. 351 Ill. App. 3d 433, 444. After this court granted the State's petition for leave to appeal, we decided *People v. Willis*, 215 Ill. 2d 517 (2005). There, we held that "*People v. Nicholas* *** [is] overruled to the extent [it] employ[s] any analysis except voluntariness in evaluating the admissibility of confessions obtained during an unreasonably long delay." *Willis*, 215 Ill. 2d at 536 n.2.

We must now decide the import of that holding in light of the facts in this case. That is, we must decide whether the 35-hour delay between the defendant's arrest and his court-reported inculpatory statement rendered that statement involuntary and thus inadmissible. We must also decide an ancillary issue: whether certain statements in the prosecution's closing argument constituted plain error. For the reasons that follow, we reverse the appellate court, affirm the trial court, and reinstate the defendant's conviction and sentence.

## BACKGROUND

The defendant's parents divorced when he was young, and he initially lived with his mother, Diane Jefferson-Nicholas, in Chicago. Their relationship soured, and he moved to Florida to live with his

father. Two months later, he moved back to Chicago and into his mother's apartment in a three-flat on South Prairie Avenue. The defendant's mother insisted that he pay rent and refrain from cursing, smoking, drinking, using drugs, and entertaining women overnight in the apartment.

The defendant found a part-time job as a United Parcel Service loader. On September 23, 1999, he left work and went to a currency exchange to cash his paycheck. He smoked marijuana and returned home, where he drank liquor with friends on the front porch of his building. After walking his girlfriend home, he drank more liquor with a friend on another porch. He returned home at 1:30 a.m. on September 24. He drank more liquor and talked on the telephone to a friend for 2½ hours, until 4 a.m. The defendant then fell asleep.

At 5:30 a.m., the defendant's mother knocked on the door to his bedroom to tell him that she had an early meeting downtown. The defendant's mother inquired about the open liquor bottles on his dresser and told the defendant that he owed her $65 for his portion of the rent and the telephone bill. The defendant responded, "I will f─ing give it to you when I am ready." His mother replied that he would have to find another place to live if he did not pay her. The defendant's mother continued to voice her problems with the defendant as she left the apartment.                    At 5:45 a.m. on September 24, 1999, Cheryl Foster, who lived across the street and a few buildings south of the defendant's building, was waiting in her living room for a visiting nurse when she heard a woman scream "No," and then heard three or four gunshots. Foster could not see outside, so she called 911. Shunte Thomas, who lived on the top floor of the defendant's building, was nursing her infant when she heard someone yell "Please don't," and then heard four gunshots. Thomas looked out her window and saw a woman lying in front of the building next to a car. Thomas also called 911, then went down a floor to tell William Penn about the shooting. Thomas and Penn went down to the first floor and knocked on the door to the defendant's apartment for several minutes. No one answered, and soon the police arrived.

Chicago Police Officer Ruth Singleton joined Thomas and Penn. The defendant eventually answered the door and was told that someone had been shot outside the building. The defendant identified

˘2˘

the shooting victim as his mother. He returned to his apartment and asked, "How am I going to get to work?" and "Whose [*sic*] going to take care of me now?" The defendant added, "Wow, I can't get my hair braided now." Officer Singleton followed the defendant into his bedroom, where he smoked a cigarette and drank a glass of liquor.

The defendant told the police that his mother left the apartment that morning carrying only the black bag recovered near her body. The police found two crocheted purses in a gangway two doors down from the defendant's building. The purses contained the defendant's mother's driver's license, wallet, checkbook, and cellphone. The police also found four shell casings from the same gun near the defendant's mother's body. An autopsy revealed four entry and two exit wounds. One bullet entered below the right nostril and exited near the left ear. Another bullet entered the right side of the neck and lacerated part of the brain and fractured the occipital bone. Another bullet entered the chest on the upper portion of the right breast, fracturing the collarbone, thoracic vertebrae, and spinal cord. A final bullet entered below the right nipple, lacerated the heart and both lungs, and exited near the left armpit.

Chicago Police Detectives Thomas Benoit and Jean Romic spoke with the defendant, who agreed to go to Area 1 Police Headquarters and to help in the investigation. Benoit and Romic took the defendant to downtown police headquarters for a polygraph test at 10 p.m., then brought him back to Area 1. The next morning, they turned the case over to Sergeant Daniel Brannigan and Detective Daniel McNally.

The defendant was placed in an unlocked interview room. Around 7:30 a.m. on September 25, 1999, Detective McNally read *Miranda* warnings to the defendant, who waived his rights and agreed to talk to the police. The defendant mentioned an argument with his mother over rent the previous morning, but he did not confess. The defendant was given water during the interview and a soft drink after the interview. He was not handcuffed; he was allowed to smoke and to use the bathroom after the interview. At 9:30 a.m., McNally read *Miranda* warnings to the defendant. The defendant again mentioned an argument with his mother, then indicated that he would like some time alone; McNally left the room. Around 10:30 a.m., McNally returned and read *Miranda* warnings to the defendant. The defendant discussed his return to Chicago and his experience living with his

mother. He did not confess, but he told the police that he was "hoping for the best" from this situation—namely, some "type of probation or boot camp."

Around 1:30 p.m., Detective McNally returned and read *Miranda* warnings to the defendant. The defendant stated that, on the morning of the shooting, his mother left the apartment by the front door, and he left the apartment by the back door. He walked through the basement toward the front of the building, where he retrieved a handgun that he had concealed under a chunk of concrete. According to the defendant, he then approached his mother and fired the gun at her three times in order to scare her. When his mother fell to the ground, he retraced his steps back to the apartment "in order to be smart." The police arrested the defendant at 2 p.m. on September 25.

After his arrest the defendant told the police that he had stashed the gun inside a television in the alley, and he agreed to accompany them there to find it. Detective McNally and Sergeant Brannigan took the defendant back to his building, but they could not find the gun. On the way back to Area 1, McNally and Brannigan bought the defendant cigarettes and fast food. When they returned to the police station and the defendant finished his lunch, Detective McNally read *Miranda* warnings to him, and he gave a detailed version of the shooting. The defendant repeated that he was trying to scare his mother when he fired the gun. The defendant signed a consent-to-search form, and McNally and Brannigan searched the apartment. They found no gun and returned to Area 1 to contact Assistant State's Attorney Lawrence O'Reilly.

O'Reilly talked to Detective McNally and reviewed police reports before meeting with the defendant at 8:15 p.m. As O'Reilly informed the defendant that he would need to read *Miranda* warnings to him, the defendant recited them back to O'Reilly and indicated that he understood his rights from watching a police program, *Cops*, on television. He was also given a drink and cigarettes. The defendant explained to O'Reilly that he argued with his mother about the rent. The defendant stated that, on the morning of the shooting, he retrieved the gun and walked through the basement to reach the front of the building. He saw his mother walking around the passenger side of the car, pointed the gun in her direction, and fired it three or four times. He then ran back into the house. When O'Reilly asked the

defendant why he shot his mother, he explained that he was hung over and angry.

O'Reilly offered to memorialize the defendant's statement in writing, to a court reporter, or on videotape. The defendant chose to give a handwritten statement, hoping to "get it over with" because he had waited so long for O'Reilly to arrive. Around 9 p.m., before the defendant had recounted anything substantive, a police officer entered the interview room to tell the defendant that an attorney had arrived and wished to speak with him. After the defendant spoke with his attorney, he invoked his right to remain silent. O'Reilly did not talk to the defendant again that night.

The next day, the police continued their investigation. Detectives Benoit and Romic visited the basement of the defendant's building and found it undisturbed. Detective McNally interviewed the defendant's girlfriend and one of his neighbors. The defendant was given donuts and juice for breakfast. Later, around 2:50 p.m., he knocked on the door of the interview room. When McNally opened the door, the defendant told him that he wanted to talk. McNally and Brannigan asked the defendant to indicate in writing that he wished to waive his right to remain silent. The defendant wrote, "I, Marcel Nicholas, asked to talk to the police ***. I wanted to." McNally read *Miranda* warnings to the defendant, and he denied involvement in the shooting. Confronted with the fact that the basement was undisturbed, the defendant stated that he had followed his mother out the front door of the apartment and shot at her to scare her.

Later, around 7:15 p.m., the defendant saw Assistant State's Attorney O'Reilly in the hall at Area 1 and asked to speak with him. O'Reilly read *Miranda* warnings to the defendant, then asked whether he had been given food, drink, and cigarettes, as well as the opportunity to use the bathroom and sleep. The defendant acknowledged that the police had treated him fairly. O'Reilly then asked the defendant if he wanted to memorialize his inculpatory statement. The defendant chose to memorialize his statement to a court reporter because he wanted it in his own words and because his hair was too unkempt for him to appear on video. While waiting for the court reporter to arrive, the defendant was given fast food, a soft drink, and cigarettes. He was allowed to call his girlfriend and to use the bathroom. The defendant started his court-reported statement at

12:35 a.m. on September 27, 1999; he completed it half an hour later, approximately 35 hours after his arrest. Once the court-reported statement was transcribed, the defendant was given the opportunity to review it and make changes. The defendant, Assistant State's Attorney O'Reilly, and Detective McNally then signed each of the statement's 46 pages. The defendant was taken to criminal court for a probable cause hearing at 6 a.m. that day, 40 hours after his arrest.

The defendant was indicted on two counts of first degree murder. The defendant never challenged the admissibility of testimony regarding his oral inculpatory statements, but he filed a motion to suppress his court-reported statement as involuntary. After a hearing at which police officers and the defendant testified, the trial court found that the defendant's court-reported statement was voluntary, based on "the credibility of all of the witnesses," and denied the motion. The defendant's case proceeded to trial. In closing arguments, the prosecutor began:

"You're 22 years old, Marcel. You need to get a job. You need to pay the rent. Where's my rent money? And what does he tell his own mother? I'll give it to you when I'm f—ing ready. His mom walks out. Well, if you don't get the money, you're going to have to move out.

And what's his reaction to that? To get his gun, hunt his mom down on the street, and point that gun at his own mother. And when she screams, please, don't, he pulls the trigger, and pulls the trigger again, and pulls the trigger again, and pulls the trigger again, pure evil.

He watches as his mother crumbles to the concrete. Does he throw the gun down, run to his mom? Mom, oh, my God, what I did I do? I'm so sorry. Somebody get help. Does he run into the house, call 911? Knock on a neighbor's door? Come out there with towels. Mom, I'm right here for you. I'm waiting for the ambulance? No, no.

He goes and gets rid of the gun, goes back into the house, and goes to bed, tries to get a little sleep. All that shooting and killing will tire a guy out—pure evil.

Concerned neighbors come to the door. They knock on the door. I don't want to get out of bed. They pound on the

door. The police come. Marcel, we're sorry to inform you, but your mother's been shot. She's passed away.

How am I going to get to work now? Can I get the keys to that truck? Marcel, your mom, she's dead in the street. Who's going to braid my hair now? Pure evil.

And it was that evil, that cold reaction, that led to his capture."

The jury found the defendant guilty of first degree murder, and the trial court sentenced him to 35 years' imprisonment. The appellate court reversed the defendant's conviction and sentence and remanded for a new trial. The defendant argued that his court-reported confession was involuntary, but the appellate court noted that "his initial presence at the police station and his early participation in the investigation process were voluntary." 351 Ill. App. 3d at 442. The appellate court continued: "[E]ven voluntary presence at a police station can turn into unlawful detention with the passage of time." 351 Ill. App. 3d at 442.

The appellate court quoted *Gerstein v. Pugh*, 420 U.S. 103, 124-25, 43 L. Ed. 2d 54, 71-72, 95 S. Ct. 854, 868-69 (1975), where the United States Supreme Court held that the State must provide "a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." The appellate court then relied upon *People v. Willis*, 344 Ill. App. 3d 868, 877 (2003), where another appellate court panel held that the proper test for the admissibility of a confession obtained after a delay that violated *Gerstein* is whether the confession is attenuated from the taint of the delay. The appellate court concluded: "We do not believe, under all the facts and circumstances of this case, that the confession can be considered free of the taint of the fourth amendment violation." 351 Ill. App. 3d at 444. The trial court should have suppressed the court-reported inculpatory statement, and the State must retry the case without it. 351 Ill. App. 3d at 444.

The appellate court further discussed the State's closing argument. The defendant did not object to the State's argument at trial or in a posttrial motion, but because certain comments may have affected the defendant's right to a fair trial, the appellate court excused this procedural default and reviewed the issue. 351 Ill. App.

3d at 448-49. The appellate court noted that, although the State has wide latitude in its remarks, it may not inflame the passions of the jury against the defendant. 351 Ill. App. 3d at 449. Accordingly, the appellate court concluded:

> "Multiple references to the prosecutor's opinion that the defendant and his conduct are 'pure evil' are inappropriate. *** There is no purpose for the addition of the phrase 'pure evil' other than to inflame the passions of the jury. Though the argument has been made that the phrase was a comment on the conduct, not the person, we find that unpersuasive ***. *** Rather than letting the evidence speak for itself, the prosecutor set out to paint Nicholas as evil. This is improper and, in light of the evidence in this case, unnecessary." 351 Ill. App. 3d at 449-50.

We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315(a).[1]

ANALYSIS

This appeal presents two issues: (1) whether the trial court erred in denying the defendant's motion to suppress his court-reported inculpatory statement, and (2) whether certain statements made by the prosecution in its closing argument constituted plain error. We address these issues in turn.

1. Admissibility of Defendant's Court-Reported Statement

The State argues that the appellate court erred in reversing the trial court's decision to deny the defendant's motion to suppress. The State asserts that the trial court was correct because the defendant's court-reported inculpatory statement, like the oral inculpatory statements that preceded it, was voluntary. The defendant argues that

---

[1]The defendant filed a motion asking us to remand this cause to the appellate court for reconsideration in light of our opinion in *Willis*. The motion was denied.

the appellate court did not err. The defendant asserts that the trial court was incorrect because his court-reported statement was involuntary. According to the defendant, he was held by the police in order to draw out a confession while they gathered evidence to justify retroactively his arrest.

We review the trial court's fact determinations for manifest error, and we review *de novo* its ultimate decision on the motion to suppress. See *People v. Love*, 199 Ill. 2d 269, 274-75 (2002), citing *In re G.O.*, 191 Ill. 2d 37, 50 (2000); *People v. Pitman*, 211 Ill. 2d 502, 511 (2004).

In *Gerstein v. Pugh*, 420 U.S. 103, 114, 43 L. Ed. 2d 54, 65, 95 S. Ct. 854, 863 (1975), the Unites States Supreme Court held that the fourth amendment requires the State to afford a fair and reliable judicial determination of probable cause either before or "promptly" after a suspect's arrest. *Gerstein*, 420 U.S. at 125, 43 L. Ed. 2d at 71-72, 95 S. Ct. at 868-69. In *County of Riverside v. McLaughlin*, 500 U.S. 44, 54, 114 L. Ed. 2d 49, 61, 111 S. Ct. 1661, 1669 (1991), the Court reiterated that the State must afford "prompt–not immediate" probable cause determinations. Generally, the State satisfies this requirement if it provides judicial determinations of probable cause within 48 hours of arrest. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. Even if a probable cause hearing is held within this 48-hour window, however, the State still may violate *Gerstein* if the defendant can prove "unreasonable delay"–chiefly, delay to gather additional evidence to justify the defendant's arrest. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

Here, the defendant was arrested at 2 p.m. on September 25, 1999, and finished his court-reported inculpatory statement around 1 a.m. on September 27, 1999. The defendant was presented to the trial court five hours later. Thus, the defendant was in custody for 35 hours before he confessed and 40 hours before he was taken before a judge–well within *McLaughlin*'s 48-hour window. Thus, the defendant bears the burden of showing that the delay was unreasonable.

The defendant argues that the delay between his arrest and his presentment was expressly to gather additional evidence to justify his arrest at an impending probable cause hearing and, therefore, that the delay was unreasonable under *Gerstein/McLaughlin*. The record,

asserts the defendant, "clearly shows that the Assistant State's Attorney would not approve the charges for a [probable cause] hearing until he got more evidence and, therefore, the investigation that the police were doing was to justify the arrest." The defendant refers to Detective McNally's testimony that "[Assistant State's Attorney] O'Reilly classified the case as a continuing investigation. In other words, he was requesting additional work to be done on the case before it would be reviewed." McNally specified that O'Reilly wanted police to recanvas the neighborhood for additional witnesses and to find the handgun. As McNally stated, "The state's attorney has to approve a felony case in order for it to go to court," where presumably the defendant would be presented for a probable cause determination. The State argues that the delay was not unreasonable or unnecessary because the police were engaged in an ongoing dialog with the defendant, which was interrupted for 18 hours between his invocation of his right to remain silent and his reinitiation of contact with the police. The State insists that the police were not gathering evidence to justify the defendant's arrest, but to bolster the case against him at trial.

Although this court has held that postarrest delays of similar duration pass constitutional muster (see *People v. House*, 141 Ill. 2d 323, 379-80 (1990) (37 hours); *People v. Nicholls*, 42 Ill. 2d 91, 101 (1969) (34 hours)), we need not decide whether the defendant has shown that the delay here was to gather additional evidence to justify his arrest, and thus ran afoul of *Gerstein/McLaughlin*. Even if there were a fourth amendment problem–and we do not suggest there was–we would still have to decide whether the defendant's confession was voluntary. See *Willis*, 215 Ill. 2d at 535 ("When faced with a *Gerstein/McLaughlin* violation, we ask simply whether the confession was voluntary").

Admitting an involuntary confession into evidence violates the fifth amendment of the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §10). A confession is voluntary if it is the product of free will, rather than the product of the inherently coercive atmosphere of the police station. See *Willis*, 215 Ill. 2d at 535. To determine whether the defendant's confession was voluntary, we consider the totality of the circumstances surrounding it, including the defendant's age, intelligence, education, experience, and physical

condition at the time of the detention and interrogation; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention–that is, whether the detention violated the fourth amendment as construed by *Gerstein* and *McLaughlin*. See *Willis*, 215 Ill. 2d at 536 (citing *People v. Ballard*, 206 Ill. 2d 151, 177 (2002), and *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996)).

At the time of the shooting, the defendant was a 22-year-old high school dropout who had no prior experience with the criminal justice system. He was taking classes toward his high school equivalency degree, and was employed by UPS as a loader. When he was arrested, he was apparently in fine physical condition, and his answers to police and prosecution questions indicate he was alert and articulate.

The defendant voluntarily accompanied the police to Area 1 on September 24, and voluntarily returned there after his polygraph test. Between his arrest at 2 p.m. on September 25 and his confession at 1 a.m. on September 27, 1999, the defendant was questioned several times. The police or prosecutor began each interview by reading to the defendant *Miranda* warnings and receiving from the defendant an acknowledgment and waiver of his rights. In one interview, the defendant even indicated he understood his rights by reciting them back to the police, stating that he had learned them from a television program. On September 25, the defendant spoke with an attorney and subsequently invoked his fifth amendment rights. The police scrupulously abided by the defendant's decision. The next day, the defendant reinitiated contact with the police, and the police obtained a written waiver from the defendant before speaking further with him. Hours later, the defendant gave a 46-page court-reported inculpatory statement.

There is no evidence of physical or mental abuse against the defendant, other than the defendant's suppression hearing testimony that unnamed police officers threatened that he would be sexually assaulted in jail. This testimony is contrary to the defendant's court-reported statement, in which he stated that he was not induced to confess, and the trial court found him to be not credible. By his own admission, the defendant was treated "very fairly, nice" while in police custody. He was given food, drink, and cigarettes throughout

his detention.[2] He was given breaks during the interrogation, he was allowed to use the bathroom, and he was never handcuffed.

Finally, the police had probable cause to arrest the defendant after his first oral inculpatory statement. This probable cause did not diminish during the defendant's detention and, in fact, increased with each additional oral inculpatory statement. The police were not required to interrupt an ongoing dialog with the defendant if the defendant was in lawful custody, had waived his *Miranda* rights, and indicated his willingness to talk to the police. See *People v. Groves*, 294 Ill. App. 3d 570, 578 (1998); *People v. Smith*, 203 Ill. App. 3d 545, 563 (1990). We agree with the State: the defendant's court-reported statement was voluntary, and admissible. The appellate court erred in reversing the trial court's order denying the defendant's motion to suppress.

## 2. Propriety of the State's Closing Argument

The State argues that the appellate court erred in concluding that certain comments in the prosecutor's closing argument deprived the defendant of a fair trial. The trial court did not rule on the propriety of the prosecution's closing argument because the defendant did not object at trial and did not challenge the argument in a posttrial motion. The appellate court excused this procedural default under the plain error doctrine.

---

[2]We must comment, in passing, upon the appellate court's statement that the defendant was "fed sporadically and, when he was fed donuts and fast food, it was with only a passing glance to the notion of nutrition." 351 Ill. App. 3d at 442-43. Nutrition is not a factor in our voluntariness calculus. It is improper for an appellate panel to imply a "square meal" requirement into its analysis of whether an inculpatory statement was made voluntarily. We find no fault with the food provided by the State to the defendant here.

Recently, in *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005), we stated:

> "[T]he plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. [Citation.] Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) [Citation.] In both instances, the burden of persuasion remains with the defendant."

Before we may apply either prong of the plain error doctrine, however, there must be a plain error. See *People v. Keene*, 169 Ill. 2d 1, 17 (1995) ("[S]hort of a conclusion that an asserted error is a 'plain' one, the so-called plain error doctrine offers no basis to excuse a procedural default"); *People v. Sims*, 192 Ill. 2d 592, 621 (2000); *People v. Wade*, 131 Ill. 2d 370, 376 (1989). Here, there was no error at all.

"The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict." T. Mauet & W. Wolfson, Trial Evidence 439 (2d ed. 2001). A prosecutor has wide latitude in making a closing argument. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields (*People v. Pasch*, 152 Ill. 2d 133, 184 (1992)), even if such inferences reflect

˘13˘

negatively on the defendant (*People v. Holman*, 103 Ill. 2d 133, 163 (1984)).

A closing argument must serve a purpose beyond inflaming the emotions of the jury. *People v. Tiller*, 94 Ill. 2d 303, 321 (1982). We recently reemphasized that a prosecutor may not characterize the defendant as an "evil" person or cast the jury's decision as a choice between "good and evil." *People v. Johnson*, 208 Ill. 2d 53, 80 (2003), citing *People v. Hudson*, 157 Ill. 2d 401, 457 (1993). But a prosecutor may comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence. See *People v. Hope*, 116 Ill. 2d 265, 277-78 (1986), citing *People v. Jackson*, 84 Ill. 2d 350, 360 (1981); *People v. Miller*, 13 Ill. 2d 84, 109 (1958); see also *People v. Moore*, 9 Ill. 2d 224, 232 (1956) (holding that a prosecutor may denounce the defendant's "wickedness"). A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Cisewski*, 118 Ill. 2d 163, 176 (1987); *People v. Buss*, 187 Ill. 2d 144, 244 (1999).

"Pure evil," as used by the prosecutor here, referred to specific actions by the defendant: getting his gun, hunting his mother in the street, pointing the gun at her, shooting her four times, stashing his gun, returning to bed, and displaying little concern about her death. The prosecutor characterized the defendant's actions as "pure evil" in order to preface his argument that the facts proved the defendant guilty. The prosecutor's remarks constituted a permissible comment upon the evidence.

Further, even if we were to conclude that the prosecutor's remarks flirted with error (see *People v. Williams*, 295 Ill. App. 3d 456, 467-68 (1998)), such putative error does not satisfy either prong of the plain error doctrine. We note that the defendant does not contend that the prosecutor's remarks deprived him of a fair trial; he simply contends that the evidence was closely balanced and that the remarks prejudiced him. We disagree. The evidence against the defendant, particularly his court-reported inculpatory statement and the oral inculpatory statements which preceded it, was strong. The brief references to "pure evil" were made at the beginning of the argument and were not repeated later. Further, before the arguments

began, the trial court preemptively cautioned the jury: "Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Any argument made by the attorneys which is not based on the evidence should be disregarded." The court repeated this caveat in the jury instructions. We cannot say that these remarks affected the outcome of the defendant's trial.

The appellate court, quoting at length from *Johnson*, intimated that the remarks here were so pervasive that they undermined the integrity and fairness of the defendant's entire trial. Again, we disagree. Unlike the remarks at issue in *Johnson*, the remarks here were isolated. They did not add their weight to a cloud of prejudice formed by a wider array of prosecutorial misconduct. The appellate court concluded, "Rather than letting the evidence speak for itself, the prosecutor set out to paint Nicholas as evil." 351 Ill. App. 3d at 450. The people of this state, however, employ prosecutors to speak for the evidence on their behalf, and prosecutors have latitude in doing so. In light of the defendant's actions, the limited references to "pure evil" were well within proper bounds of a closing argument, and the appellate court improperly concluded that the prosecutor's argument was plain error.

## CONCLUSION

For the reasons that we have stated, we reverse the judgment of the appellate court, affirm the judgment of the trial court, and reinstate the defendant's conviction and sentence.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*