2019 IL App (2d) 170381-U
No. 2-17-0381
Order filed November 4, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-2263 |
| DONTRA X. DAVIS, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant showed no plain error in the State's rebuttal argument: the remarks at issue were not necessarily error, and in any event they were not pervasive, the court properly instructed the jury on closing arguments, and the evidence against defendant was strong.

¶ 2    Following a jury trial, defendant, Dontra X. Davis, was convicted of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)) and unlawful possession of a weapon by a felon while on parole (*id.*), and he was sentenced to 10 years' imprisonment. On appeal, he argues that he is entitled to a new trial, because the State made an improper argument when it stated several times at the beginning of rebuttal that defendant did not care for the safety of

innocent people in the area. Because we determine that the comments were isolated, the jury was properly instructed to disregard any arguments not based on the evidence, and the evidence against defendant was strong, we find no plain error. Accordingly, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4     Defendant was charged with various offenses related to a shooting. These included reckless discharge of a firearm (*id.* § 24-1.5(a)) and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)). Prior to trial, the State dismissed these charges, opting to proceed on only the charges of unlawful possession of a weapon by a felon and unlawful possession of a weapon by a felon while on parole.

¶ 5     Evidence presented at trial revealed that, early in the morning of August 20, 2016, Kenneth Guge, a security guard for the Howard Johnson's and Gojo's in Waukegan, was in the Gojo's parking lot talking to a man in a maroon minivan. The van's driver's door was open. Guge heard gunfire and was shot in the foot. Guge saw the driver of the van back up and hit another car with the open driver's door. The van's door was damaged.

¶ 6     Casmir Rincon, a retired police officer, was in another maroon minivan in the Gojo's parking lot in Waukegan.[1] He heard gunfire coming from behind his vehicle. He then saw a man running. Although he did not get a good look at the man's face, he noticed that the man was black, young, thin, and about 5-feet, 10-inches tall. He also saw that the man was wearing jeans with a design on the thighs and a greenish-blue short-sleeved shirt without a collar. The man was carrying

_____

[1] Rincon indicated that the lights in the parking lot are nitrogen and can affect the color of things depicted in surveillance videos. We tend to agree, as Rincon's maroon minivan appears vibrant purple in the video.

a semi-automatic handgun in his right hand. The man fired the gun numerous times while running. A maroon minivan pulled up behind Rincon's vehicle, the man got in the van, and the van left the area.

¶ 7    Surveillance videos from that night were admitted. The video of the inside of Gojo's is fairly clear. At 1:06:41, a thin, black, young man, later identified as defendant, enters wearing baggy light-colored jeans and what appears to be a solid green T-shirt with an Izod alligator on the right chest. Many people are inside socializing and eating. Defendant exits Gojo's at 1:43:35.

¶ 8    The video clips of the areas around the outside of the Gojo's are less than clear. Video of the side parking lot shows several cars parked in the Gojo's parking lot, people milling around, and light traffic on the street abutting the restaurant. A thin, young, black man in light-colored baggy pants and a darker short-sleeved T-shirt is talking to a young black woman in the parking lot at 1:45:15. The couple is standing close to a minivan parked in the lot. The minivan appears light-colored. Guge is standing next to this minivan.

¶ 9    At 1:45:28, the shooting starts behind the Gojo's. The man runs to the side of the van he is standing by, remaining there for about 10 seconds. The man then emerges from the side of the van, confronts a larger black man standing in the parking lot, and runs behind Rincon's van while carrying something in his right hand that could be a gun. The man runs off screen at 1:45:44. At 1:45:53, the man runs from behind the Gojo's and returns to the side parking lot where he was seen talking to the young black woman. The van that the man was standing by pulls out of its parking space, damaging its open driver's door. The van stops close to the back of Rincon's van, and the man gets in the passenger side at 1:45:57. The van leaves the parking lot, driving behind the Gojo's at 1:46:10.

¶ 10    At the scene, officers found numerous bullet casings. Twenty-three casings were collected and examined by a forensic scientist. The forensic scientist determined that the casings came from three different guns. More specifically, the forensic scientist determined that nine casings came from one gun, seven came from a second gun, and seven came from a third gun.

¶ 11    Officers also collected samples of blood on the ground around some of the casings. Testing on the samples confirmed that the blood was defendant's.

¶ 12    At the hospital later that morning, defendant told the police that he was hanging out in the parking lot of Gojo's when someone started shooting. Defendant was shot in the foot, and he wrapped his foot in his shirt. Defendant said that his cousin, Vic, whose last name he did not know, drove him to the hospital in Vic's black sport utility vehicle with "bowls rims." Officers collected from defendant's hospital room jeans with monograms on the pockets and a green T-shirt with vertical dark stripes and an Izod alligator on the right chest.[2] There was blood on the T-shirt. Testing conducted on gunshot residue collected from defendant's hands revealed that defendant had a greater concentration of gunshot residue on his right hand.[3] The forensic scientist

_____

[2] A picture of the green T-shirt is included in the record. Neither the jeans nor a photograph of the jeans is included in the record.

[3] The forensic scientist who tested the gunshot-residue samples indicated that eight tricomponent particles were found on the sample taken from defendant's right hand and that the scientist confirmed five. On the left sample, three tricomponent particles were found, and the scientist confirmed two, which is one less than what is required for a positive finding. Because of the sufficient results from the right-hand sample, no further testing was done on the left-hand sample.

who tested the samples indicated that gunshot residue can be found on a person's hands if the person fired a gun, was within 12 feet of someone who fired a gun, or came in contact with an object that had gunshot residue on it.

¶ 13     Officers saw the maroon minivan with the damaged door at the hospital.  Inside the minivan were shoes with blood on them; blue jeans with a design on one thigh; and a light-blue shirt.[4] Rincon identified the green T-shirt with stripes and an Izod alligator as looking more like the shirt the gunman was wearing.  Rincon also believed that the jeans recovered from the minivan looked like the ones the gunman was wearing.  Officers also found blood on the dashboard by the front passenger seat and on the captain's chair in the middle of the backseat.  Testing conducted on swabs taken of the blood on the captain's chair revealed that the blood came from defendant.

¶ 14     Before the parties gave their closing arguments, the court advised the jury that "[w]hat the lawyers say during arguments is not evidence and should not be considered by you as evidence." The State argued in closing that it did not have to prove that defendant fired a gun.  Rather, the State asserted that it needed to establish only that defendant possessed the gun.  The State continued that it was clear that the man seen inside the Gojo's was the gunman in the parking lot.

¶ 15     Defendant, who agreed with most of the State's evidence, noted that the video showed people milling around the Gojo's and that none of these people identified defendant as the gunman. Defendant argued that he was not identified, because he was not the gunman.

¶ 16     In its 28-page rebuttal, the State began with the following statement:

_____

[4] Neither the shirt (or a photograph of the shirt) nor the jeans (or a photograph of the jeans) is included in the record.

"On August 20, 2016, the defendant was a convicted felon. He was also on parole. Here in the State of Illinois if you're a person with that status you are not allowed to possess a gun. Probably good idea. Not only did defendant choose to possess a gun that night, but what he did with that gun showed a blatant disregard for the lives of everyone in and around that restaurant that night.

The defendant got shot at and as the people who shot at him were fleeing he decided it was a good idea to get his gun and run across a crowded parking lot and fire back at them. He didn't care. He didn't care about the safety and well-being of *** Ricon [*sic*] ***. He didn't care about the safety and well-being of the poor Gojo's employee *** who popped his head up after the shooting was over.

The defendant didn't care about the safety and well-being of anyone in that parking lot, in that restaurant, or out on—or anyone who would have been driving by on Belvidere Road. All he cared about was they shot me. They are trying to get away. I am going to run after them and I am going to shoot at them. And that is how innocent people get killed. Now thankfully that didn't happen in this case."

Defendant never objected to these statements.

¶ 17    Immediately thereafter, the State asserted:

"What I want to emphasize to you is that there is only one question for you to answer in this trial. [Originally, we] told you there were two, whether the running gunman had a gun and whether the running gunman is the defendant. Now we have heard it from the defense attorney they [*sic*] do not appear to be disputing that the running gunman had a gun obviously."

The State repeated during its rebuttal, while it played and discussed the surveillance video, that the only issue the jury needed to consider was whether defendant was the gunman.

¶ 18    After closing arguments, the court instructed the jury that "[t]he evidence which you should consider consists only of the testimony of the witnesses and the exhibits and stipulations which the court has received." The court also instructed the jury that "[n]either opening statements [nor] closing arguments are evidence, and any statement or argument made by attorneys which is not based upon the evidence should be disregarded."

¶ 19    Although defendant filed several posttrial motions, he never challenged the State's rebuttal argument. This timely appeal followed.

¶ 20                              II. ANALYSIS

¶ 21    At issue in this appeal is whether defendant is entitled to a new trial, because the State made inflammatory remarks in rebuttal about defendant's disregard for the safety of innocent people. Defendant acknowledges that the issue is forfeited, as he never raised the issue in the trial court. Nevertheless, defendant asks this court to consider the comments in light of the plain-error rule. See *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 46.

¶ 22    The defendant bears the burden of establishing plain error. *People v. Herron*, 215 Ill. 2d 167, 182 (2005). He must establish that the forfeited issue should be considered because (1) regardless of the seriousness of the error, the evidence is close, or (2) regardless of the closeness of the evidence, the error is serious. *Holmon*, 2019 IL App (5th) 160207, ¶ 46. Under the first prong, we must consider whether the evidence was so closely balanced that the error alone tipped the scales of justice against the defendant. *Id.* Under the second prong, we must consider whether the error was of such magnitude that the error undermined the fairness of the defendant's trial or the integrity of the judicial process. *Id.* All of that said, before considering either prong,

we must consider whether there was reversible error. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 23    In determining whether there was reversible error, we note that our supreme court has applied both a *de novo* standard (see *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)) and an abuse-of-discretion standard (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) in reviewing allegedly improper closing statements. *People v. Ali*, 2019 IL App (2d) 161016, ¶ 13.  We need not decide here what standard should apply, as we conclude that, under either standard, defendant has not established reversible error.

¶ 24    The State has wide latitude in making a closing argument. *Nicholas*, 218 Ill. 2d at 121. The State may comment on the evidence and any reasonable inferences to draw from it. *Id.*  This is true even when the inferences reflect negatively on the defendant. *Id.*  However, the State cannot use closing argument to inflame the jury's emotions. *Id.*  The State cannot characterize the defendant as an evil person or cast the jury's decision as a choice between good and evil. *Id.* However, the State may comment unfavorably on the evil effects of crime. *Id.* at 121-22; see also *Holmon*, 2019 IL App (5th) 160207, ¶ 51.  In considering whether the State overstepped in making closing remarks, we must consider the closing argument in its entirety and the remarks in context. *Nicholas*, 218 Ill. 2d at 122.

¶ 25    Here, viewing the rebuttal in its entirety and the remarks in context, we cannot conclude that the State's remarks about defendant's disregard for the safety of innocent people were reversible error.  In its rebuttal, the State used the surveillance video.  The surveillance video showed that there were several people in the area when the shooting occurred.  Thus, the remarks could be seen as a comment on the evidence presented.  Further, the remarks could just as easily be seen as a comment on the evil effects of crime.  That is, innocent people might very well be

shot when a known felon possesses a gun and runs around firing it in a populated area. In fact, Guge was an innocent person who was so affected. Even if the remarks could be considered to be improper, the remarks comprised only a small part of the rebuttal, wherein the State repeatedly emphasized that the real issue in the case was the identity of the gunman. See *id.* (in finding no plain error, court observed that improper remarks were brief, made at the beginning of argument, and not repeated). The trial court also admonished the jury several times that closing arguments are not evidence and that the jury should not consider any argument that was not based on the evidence. See *id.* at 122-23 (in finding no plain error, court noted that the trial court admonished the jury before closing argument and before deliberations that what the attorneys said in closing was not evidence and should be disregarded if not based on the evidence). All of that aside, the evidence against defendant was strong. Defendant's presence in the Gojo's around the time of the shooting, his resemblance to the gunman, the presence of gunshot residue on the same hand that the gunman used to fire his weapon, and the presence of his blood where the bullet casings were found and in the van that escorted the gunman from the scene indicated that defendant was in fact the gunman. See *id.* (in finding no plain error, court remarked that the evidence against the defendant was strong).

¶ 26     Defendant argues that this case is controlled by *People v. Johnson*, 208 Ill. 2d 53 (2003), and *People v. Blue*, 189 Ill. 2d 99 (2000), which involved the same incident. In both cases, our supreme court concluded that the defendants were entitled to new trials because the State had engaged in pervasive misconduct. See *Johnson*, 208 Ill. 2d at 84 ("As in *Blue*, we see in this case cumulative error and a pervasive pattern of unfair prejudice that denied [the] defendant a fair trial and cast doubt upon the reliability of the judicial process.").

¶ 27  Here, unlike in *Johnson* and *Blue*, the State's alleged misconduct was limited to, at best, six statements made at the beginning of rebuttal. This is diametrically different from the pervasive pattern of misconduct in *Johnson* and *Blue*. Because it is, we find neither *Johnson* nor *Blue* applicable here. For similar reasons, we find defendant's reliance on *People v. Roman*, 323 Ill. App. 3d 988 (2001), and *People v. Terry*, 312 Ill. App. 3d 984 (2000), misplaced. *Roman* involved several incidents of prosecutorial misconduct while *Terry* concerned unsupported and highly prejudicial claims that the defendant was involved in a gang and sold illegal drugs. *Roman*, 323 Ill. App. 3d at 999-1001; *Terry*, 312 Ill. App. 3d at 992. Such circumstances are not present here.

¶ 28  Moreover, although defendant is correct that, as in *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 107, the State's remarks can be seen as a comment on charges against defendant that were no longer at issue, the jurors here, unlike the ones in *Mpulamasaka*, were made well aware of the fact that the only issue before them was whether defendant possessed a gun. In fact, defendant himself made that clear several times during rebuttal.

¶ 29                        III. CONCLUSION

¶ 30  For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 31  Affirmed.