**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230517-U

Order filed March 20, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0517 Circuit No. 21-CF-681 |
| | ) | |
| ISACC SMITH, | ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice Brennan and Justice Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: (1) The evidence was sufficient to support the jury's finding that the defendant did not act in defense of person. (2) The State did not commit prosecutorial error in closing arguments.

¶ 2    The defendant, Isacc Smith, appeals his conviction for aggravated battery with a firearm, arguing (1) the State failed to prove him guilty beyond a reasonable doubt where the defendant reasonably believed his actions were necessary to protect another and (2) the State committed prosecutorial error during closing arguments. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          The State charged the defendant with aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2020)). The indictment alleged that the defendant knowingly caused "an injury" to Jayden Harris by discharging a firearm and shooting Harris in the face. On April 24, 2023, the matter proceeded to a jury trial.

¶ 5          Officer Shawn Lade testified that on September 26, 2021, at approximately 1:50 a.m. he heard three gunshots near TJ Donlin's bar and immediately entered the parking lot. Lade observed "a lot of people running in the area in different directions." Lade spoke with an individual who identified the defendant as the shooter and the vehicle in which the defendant was in. As Lade ordered the vehicle to stop, the vehicle continued to drive out of the parking lot, before eventually being stopped by other officers. Harris had a gunshot wound to his jaw and was transported to the hospital. Lade located three spent shell casings and bullet fragments in the parking lot. A forensic scientist subsequently determined that all three spent shell casings were discharged from the same firearm.

¶ 6          The video surveillance of the parking lot showed many individuals leaving the bar, entering the parking lot, and congregating. The defendant, Kiley Mullady, Dajon Smith, Dajuan Smith, and Harris were among the large group. Several individuals appeared to be gesticulating with their arms at each other. The crowd began to draw closer to each other. Harris punched Dajon and Dajon swung at Harris. The defendant was standing directly behind Dajon. The defendant reached into his waistband and removed a firearm. With an outstretched arm, the defendant walked into the crowd shooting the firearm.

¶ 7          Dajuan recalled being arrested on September 26, 2021, and stated that he was with the defendant, Dajon, and Mullady. Dajuan did not recall speaking with police about the shooting. The

State played Dajuan's police interview where he described an escalating situation in the parking lot and "somebody swung" at Dajon. Dajuan said gunshots were then fired and he did not know where the shots originated from. After the gunshots, Dajuan entered a vehicle with the defendant, Dajon, and Mullady. Dajuan said that no one in the vehicle had a firearm and he did not know that the defendant had a firearm. When asked if "anyone else ha[d] a gun," referring to the other group of individuals at the scene, Dajuan responded, "One of them did. One of them probably had a gun. *** I wouldn't put it past them." The detective replied, "Right? I wouldn't either."

¶ 8        On cross-examination, Dajuan described leaving the bar when two vehicles pulled into the parking lot. The individuals from the vehicles surrounded Dajuan and his group. At that point, there was "some type of altercation" where "somebody swung at [Dajon]" and "shots [were] fired." Dajuan did not know who used the firearm. Dajuan did not know anyone in the large group and many individuals wore masks. When counsel asked if Dajuan "thought somebody had a gun," Dajuan responded, "I wouldn't put it past anybody" but he did not see any weapons.

¶ 9        Harris testified that at the time of trial he was 19 years old and had pending charges for aggravated discharge of a firearm. On September 26, 2021, Harris was in the bar's parking lot when he was shot. Harris did not recall being taken to the hospital, being treated for his gunshot injuries, or talking to the police. A video recording of Harris's police interview showed that he was in the hospital with an injury to his face and had difficulty speaking. During the interview, Harris stated that he did not know who shot him. Harris further indicated that he did not know the defendant.

¶ 10        In the defendant's case-in-chief, Dajon testified that on September 26, 2021, he was 25 years old. When Dajon entered the bar's parking lot he walked into "a large group of people arguing" with his smaller group. Dajon described the larger group as "threatening," "[v]ery

hostile," "antagonizing," "looking for trouble," and "spewing and spouting profanities." Dajon did not know who the individuals were and stated that some individuals wore ski masks. Dajon exchanged words with another individual when suddenly Harris "stepped up and punched" him in the mouth. Dajon stated he weighed approximately 250 pounds and estimated that Harris weighed "145 soaking wet." Dajon maintained that he feared Harris because Harris "had a gun in his \*\*\* waistband or in his pocket." Dajon stated that he did not see the gun on Harris's hip "until [they] were closer in each other's face." However, he could not recall at what point he observed Harris have a firearm, and Harris never removed anything from his waistband. Dajon "was afraid that someone would get shot or worse" and did not "know if that's even the only weapon they had." Dajon did not see the gunshots but heard them and "was in shock."

¶ 11      Jamal Ford testified that on January 26, 2021, he was involved in a robbery when Harris shot him. Ford was in a vehicle with two other individuals and Harris. Harris pulled a firearm from his waistband and pointed it at the driver's head, demanding money. Ford "grabbed" Harris, punched him, and attempted to exit the vehicle when Harris shot him in the abdomen.

¶ 12      The defendant testified that in the early morning hours of September 26, 2021, he was leaving the bar and observed two vehicles entering the parking lot. Individuals in the vehicles were yelling out the window at him and "trying to start [an] altercation." The group grew and began to surround Dajon, Dajuan, the defendant, and Mullady. The defendant could see "items bulging from their hoodies, and \*\*\* the gun on [Harris's] waist." The defendant made these observations when Harris "started jumping around and getting rowdy" and that is when the defendant "really got \*\*\* scared." After Harris hit Dajon, the defendant "didn't know how [Harris] was going to react" and "didn't know if [Harris] was going to shoot [Dajon]" or himself, so the defendant "shot [Harris]." The defendant explained that he thought he "was going to die, or the people [he] was with were

4

going to die." After the shooting, the defendant ran to the vehicle and discarded the firearm. When asked if the defendant was "the only one that fired a gun at that point," the defendant responded, "To my knowledge. I know they had guns as well." The defendant initially told the police that he "didn't see any gun" and his "group had nothing to do with" the shooting.

¶ 13    In the video of the defendant's interview, he denied being involved in the shooting or that anyone was trying to fight. When the officer showed the defendant the surveillance video of the defendant shooting a firearm at Harris and leaving the scene, the defendant stated that he did not remember what happened. The defendant testified that the statements he made to the officer were not true and he lied because he "didn't know what to do." The defendant observed in the video that Harris was "getting ready to fight" and was "right in front of [Dajon]." When asked, "[d]id you see *** the gun then in [Harris's] hands or anything?" the defendant responded, "[Harris] didn't get a chance to get it."

¶ 14    In its closing argument, the State recited the charge and what was required to prove the defendant guilty beyond a reasonable doubt. The State addressed the defendant's claim that he was "justified in using that bodily harm or that force, and *** was acting reasonable" in defense of person. The State explained, "you can't go and shoot someone if they push you. *** [W]hether there was any evidence that, *** Harris had a gun in *** his waistband. Well, [the defendant] still is not allowed to shoot him." The State continued, "If he has a gun on him and throws a punch, you're going to shoot him? That is not what's allowed in our statute," and the State read the relevant jury instruction. The State asked the jury to consider whether the defendant's actions were "rational and reasonable" and whether the defendant "believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself or another." The State asserted, "And if they say, Well, [the defendant] was scared and stuff like that, that's not the issue." The State

5

explained, "As a reasonable person there, does [the defendant] have the right to do that? *** That if someone throws a punch and has a gun or something, then we can shoot them dead or shoot them in the mouth?" The State addressed Dajuan's recorded interview, and stated, Dajuan "says nothing about another gun. He says there was no other gun there." The State pointed to Dajon's testimony that Harris had a firearm, saying this was "the first time" Harris's possession of a firearm was mentioned.

¶ 15        In rebuttal argument, the State discussed the witnesses' police interviews and remarked

> "When you're at the police station ***, if you want to not say something about [the defendant] doing this crime—even though it's quite obviously happening in front of you—*** what do you say?

> *** Harris had a gun. *** Harris had a gun.

> Defendant was asked time and time against about a gun, a gun, and a gun.

> Did anybody else have a gun? No.

> And, in fact, Dajuan was asked over there: Did anyone else have a gun besides the person that shot? No.

> *** If anyone saw *** Harris with a gun, they would have said it at that time, but it wasn't said because that was something that was made up after that day. It was made up for this trial."

The State continued that the defendant claimed Harris had a firearm, but whether "Harris had a gun or not, I submit to you, you don't get a right to shoot him for throwing a punch. Whether there is a gun in his waistband or not, you don't get the right to shoot a person for throwing a punch." The State noted that justified force included when "someone came out with a gun and is pointing

6

at him, that's when. If someone is reaching for a gun and pulling it up and saying bad words, that's when. Not when someone throws a punch."

¶ 16    During closing arguments, the court stated to the jury,

"you are the sole finders of fact in this case, so it's up for you to determine whether or not—and who is telling the truth, and who's not telling the truth.

This is closing arguments. If an attorney for either side says something that is not supported by the evidence, you are to disregard that. You are the finders of fact in this case."

Further stating, "[c]losing arguments are just that. They are arguments, and whatever inferences come, they are up to you ultimately to make." The court subsequently instructed the jury that "[o]nly you are the judges of the believability of the witnesses, and of the weight to be given *** to the testimony of each of them." The court continued that closing arguments are not evidence and "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." The court also instructed the jury regarding the nature of the offense and what the State was legally required to prove, beyond a reasonable doubt, in light of the defendant's affirmative defense of person claim. Following deliberation, the jury found the defendant guilty of aggravated battery with a firearm. The court denied the defendant's motion for a new trial and sentenced the defendant to eight years' imprisonment. The defendant appealed.

¶ 17                                   II. ANALYSIS

¶ 18                            A. Sufficiency of the Evidence

¶ 19    On appeal, the defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm where he reasonably believed his actions were necessary to protect another. As an affirmative defense, once a defendant raises a defense of

7

person claim, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in defense of another, in addition to proving the elements of the charged offense. *People v. Gray*, 2017 IL 120958, ¶ 50. The elements necessary to establish a claim of defense of person are:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *Id.*

See 720 ILCS 5/7-1 (West 2020). If the State negates any one of these elements, a defendant's defense of person claim cannot prevail. *Gray*, 2017 IL 120958, ¶ 50. "The relevant standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in [defense of another]." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 20        A person is "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." 720 ILCS 5/7-1(a) (West 2020). This determination is dependent upon the circumstances involved. *People v. Woods*, 81 Ill. 2d 537, 542 (1980). When presented with a challenge to the sufficiency of the evidence, we will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. Determinations of witness credibility, the weight to be given to testimony, and the reasonable inferences to be drawn from the evidence are responsibilities for the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). "A conviction will be

8

reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 21 Initially, we note that the only evidence that Harris had a firearm came from Dajon and the defendant's testimony at trial. While defendant testified at trial that Harris had a firearm, he had told officers after the incident that he did not see any firearms. Moreover, Dajon could not identify when he first saw Harris's firearm. Dajuan never indicated that he saw Harris with a firearm.[1] Considering the testimony before it, a rational jury could have found the defendant and Dajon's testimonies at trial incredible and found that Harris did not possess a firearm at the time of the altercation. See *People v. Purdle*, 212 Ill. App. 3d 594, 598 (1991); *People v. Akis*, 63 Ill. 2d 296, 298 (1976) ("[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence."); Illinois Pattern Jury Instruction, Criminal, No. 3.11 (approved Oct. 17, 2014) (the jury has a duty to evaluate the defendant's testimony in contrast with his prior inconsistent statements).

¶ 22 Moreover, the evidence showed that the defendant shot Harris in the face immediately after Harris struck Dajon. Harris did not reach for his waistband. Further weighing against the claim of defense of person, Dajon was older and weighed significantly more than Harris. While Harris was the initial aggressor, there was no indication that Harris would use deadly force that the defendant could reasonably respond to with shooting Harris. See 720 ILCS 5/7-1(a) (West 2020). Instead, Harris struck Dajon and Dajon appropriately responded by striking Harris. The defendant unreasonably inserted himself into a fistfight and shot a firearm *multiple* times at Harris. See

---

[1]We note that, multiple times in his brief, the defendant focuses on the fact that Dajuan told the detective, "One of them probably had a gun. *** I wouldn't put it past them," and the detective responded, "Right? I wouldn't either." The defendant appears to believe this is substantive evidence that the detective believed Harris had a gun. We note that detectives may employ trickery and deceit when interviewing (*People v. Leanos*, 2023 IL App (1st) 191079, ¶ 44). Therefore, the detective's statement to Dajuan did not amount to evidence that Harris had a firearm or even that he believed Harris had a firearm.

*People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying [the] use of deadly force."). While the defendant asserted that he subjectively feared that Harris would cause imminent harm to himself or another due to the large group, Harris's demeanor, and Harris's firearm, the jury was not required to believe the defendant's account of the incident. See *Purdle*, 212 Ill. App. 3d at 598. Taking the evidence in the light most favorable to the State, a rational jury could have determined that the defendant's subjective belief in the need for the force he used was unreasonable.

¶ 23                                                    B. Prosecutorial Error

¶ 24        The defendant further argues the State committed several errors during their closing and rebuttal arguments. Specifically, the defendant contends that the State made three statements misrepresenting the law, including (1) the defendant's fear during the incident was irrelevant, (2) whether Harris had a firearm did not factor into the reasonableness determination to "shoot someone for throwing a punch," and (3) "under the law of defense of person, [the defendant was required] to wait until Harris had pulled a gun and pointed it at [the defendant] to fire," which prejudiced the defendant and amounts to reversible error. Additionally, the defendant asserts that the State argued facts not in evidence, when stating that Dajuan never informed police that another person had a gun. These alleged errors are forfeited, and the defendant asks for plain error review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 25        Prosecutors have wide latitude in the content of their closing arguments. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). The prosecutor may remark on the evidence and any fair and reasonable inference the evidence

10

may yield, even if the suggested inference reflects negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). "Generally, improper closing arguments by the State will constitute reversible error only if there is doubt as to whether the jury would have rendered a guilty verdict in the absence of the comments." *People v. Libberton*, 346 Ill. App. 3d 912, 924 (2003). When a

> "prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant [citation], taking into account the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." (Internal quotation marks omitted.) *People v. Williams*, 192 Ill. 2d 548, 573 (2000).

¶ 26 First, the defendant takes issue with the State's comment, "Well, [the defendant] was scared and stuff like that, that's not the issue." We note that the State had correctly conveyed the applicable law earlier in its closing argument. The State was commenting on the fact that, while the jury heard the defendant state that he was scared, that was not the only issue. The defendant may have been subjectively scared, but the analysis must also include whether the defendant's fear was objectively reasonable. See *Gray*, 2017 IL 120958, ¶ 50; see also 720 ILCS 5/7-1 (West 2020). Therefore, the comment was not error.

¶ 27 Second, the defendant argues that the State's comment regarding whether Harris had a firearm did not factor into the reasonableness determination to "shoot someone for throwing a punch" was an incorrect statement of law. The State said, "you can't go and shoot someone if they push you. *** [W]hether there was any evidence that, *** Harris had a gun in *** his waistband. Well, [the defendant] still is not allowed to shoot him." The State applied the law to the facts when it asked the jury whether the defendant's action was "rational and reasonable" and whether the

11

defendant "believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself or another" consistent with the applicable law. See 720 ILCS 5/7-1 (West 2020). Moreover, as indicated above, there is case law that states that shooting a firearm is not a proper response to a punch. See *Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying [the] use of deadly force."). When viewing the argument as a whole, the State's comments were not a mischaracterization of the law.

¶ 28     Third, the defendant argues that the State's characterization of justified force, in that it stated when "someone came out with a gun and is pointing at him, that's when. If someone is reaching for a gun and pulling it up and saying bad words, that's when. Not when someone throws a punch," was legally incorrect and misleading. The defendant asserts that these statements would have led the jury to believe that the defendant "was categorically barred" from proving a defense of person claim by shooting a gun where the defendant observed Harris possess a firearm and punch Dajon. We disagree. The jury was asked to determine whether, given the particular facts, the defendant acted reasonably. Here, the State provided two examples of justified force in relation to the particular facts of this case. The State did not limit the legal application of justified force to only those two instances across the board. Further, the State never argued that the defendant needed to wait until Harris shot him before he was allowed to draw his own gun. In the context of the State's whole argument, the comments were not error.

¶ 29     Finally, the defendant contends that the State's comments regarding Dajuan's police interview, in that, Dajuan "says nothing about another gun" and "Dajuan was asked over there: Did anyone else have a gun besides the person that shot? No," were incorrect statements of fact. Here, we note that the jury heard Dajuan's interview where he stated, "One of them did. One of

12

them probably had a gun. *** I wouldn't put it past them." When counsel asked at trial if Dajuan "thought somebody had a gun," Dajuan responded, "I wouldn't put it past anybody" but he did not see any weapons. Neither statement suggested that Harris possessed a firearm. At best, Dajuan's initial statements could suggest that another person had a firearm. However, this statement is contradicted by Dajuan's trial testimony that he did not see any other weapons. Based on these contradicting statements, and in light of the other evidence presented, the State's recitation of the facts presented was appropriate. Therefore, no error occurred in the State's closing arguments.

¶ 30                                    III. CONCLUSION

¶ 31        The judgment of the circuit court of Kankakee County is affirmed.

¶ 32        Affirmed.