**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170126-U

Order filed February 13, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0126 Circuit No. 07-CF-1554 |
| MARTIN E. GOMEZ, | ) ) ) | Honorable Carmen Julia Goodman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Justice Schmidt concurred in the judgment.
Justice McDade dissented.

_____

**ORDER**

¶ 1      *Held*: (1) Prosecutor's comments in closing rebuttal argument did not amount to prosecutorial misconduct; and (2) the circuit court's error in admonishing the venire was not plain error because the evidence at trial was not closely balanced.

¶ 2      Defendant, Martin E. Gomez, appeals following his convictions for first degree murder and armed robbery. He argues that the State committed prosecutorial misconduct in that it asserted facts not in evidence and misstated the evidence in its closing rebuttal argument. He also

argues that the circuit court erred in admonishing the venire, and that that error is reversible under the closely balanced prong of plain error. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with four counts of first degree murder in the death of Joseph Salamie. 720 ILCS 5/9-1(a)(1) (West 2006) (intent to kill); *id.* § 9-1(a)(2) (strong probability of death); *id.* § 9-1(a)(3) (felony murder—two counts). He was also charged with armed robbery (*id.* § 18-2(a)(1)) and home invasion (*id.* § 12-11(a)(2)), each of which also served as the underlying felony in the two charges of felony murder.

¶ 5      Defendant's jury trial commenced on October 24, 2016, with defendant proceeding *pro se*.[1] During jury selection, the circuit court asked the venire whether it understood and accepted certain legal principles. After each potential juror responded affirmatively, the court asked: "Do you understand that this means the State has the burden of proving the defendant's guilt beyond a reasonable doubt, that the defendant does not have to prove his innocence?" Once again, every potential juror responded affirmatively.

¶ 6      The evidence at trial established that Will County sheriff's deputies were dispatched to Peotone to conduct a welfare check on Salamie at approximately 10:15 p.m. on May 9, 2007. Responding officers found what appeared to be blood in the driveway, on the porch, and on the front door of the home. Upon entering the home, officers observed signs of a struggle, including more suspected blood on a couch and the floor. A red diluted substance was found in the first-floor bathroom. Paper towels and bleach were found on the kitchen counter.

---

[1]Defendant had previously been found guilty on all counts following a trial at which he also proceeded *pro se*. However, this court vacated those convictions on the grounds that defendant had been improperly admonished regarding his waiver of counsel. *People v. Gomez*, 2013 IL App (3d) 110444-U.

¶ 7        The body of Salamie was discovered face down in a ditch near a fence on the property. The position of the body and condition of the surrounding grass were consistent with the body having been dragged to that spot. An autopsy revealed that Salamie had been stabbed or incised 111 times to the head, face, neck, back, shoulders, abdomen, and hands. Salamie bled to death over several minutes. It was estimated that Salamie died between 9 p.m. on May 8 and 9 a.m. on May 9. The parties stipulated that the last outgoing phone call from Salamie's phone was placed at 10:21 p.m. on May 8, 2007.

¶ 8        Other testimony established that Salamie lived on a 10-acre horse farm. The property included the house as well as a trailer, which Salamie rented to people who helped on the farm. Salamie frequently carried large amounts of cash from the multiple retail businesses that he owned. A search of the trailer on Salamie's property found a letter addressed to defendant. In August 2006, defendant had worked for Salamie and lived in the trailer.

¶ 9        Jessica Gustafson testified that defendant became her boyfriend in February 2007. They lived together at that time in a trailer park in St. Anne. Gustafson recalled a night in May 2007, when defendant told her he was going to visit a friend in the neighborhood. Gustafson went to bed around 9 that night and did not see defendant again until "[l]ater that night when he came home." Gustafson testified that when defendant returned to the trailer "[h]e had blood all over his clothes." Defendant told Gustafson that he had just killed a man named Joe. Gustafson had never met Joe, but she knew that he was formerly defendant's landlord.

¶ 10       Gustafson testified that defendant told her he had gone to Salamie's house to rob him. Defendant explained to Gustafson what had happened:

> "[Defendant] told me that he told Joe to get on the ground and that if he complies no one will get hurt or something, and Joe—he said that Joe didn't get on the

3

ground; that he had a shotgun next to him that he pulled out, which I later found out wasn't true. He never had a gun, but he told me he had a gun and he pulled it out, so he stabbed him, and so he was chasing him around the house and outside and into the barn like stabbing him multiple times. He said it was like two hundred, because he wouldn't die. He said he wasn't using like a big knife. It was just like a little—like something like a box cutter, I guess, he said; and then after he stabbed him a million times and he wouldn't die because it was a smaller weapon, he ripped his throat out."

¶ 11 Gustafson testified that defendant had Salamie's wallet. She also observed $1200 in cash, which defendant told her was from Salamie. She noticed that there was blood on the money. Gustafson also testified that either the next day or the day after, she and defendant put his blood-covered clothes in a plastic bag, drove to Momence, and threw the bag into a river.

¶ 12 Gustafson and defendant spent the $1200. They paid a bill, then went to a mall and purchased a poster and some shoes. Gustafson testified that they also bought cannabis with the money. They bought the cannabis from a woman with whom Gustafson worked. Gustafson observed that defendant paid for the cannabis with "bloody money." Gustafson drove a blue Pontiac; both hers and defendant's name were on the title. Gustafson later noticed a card with Salamie's name on it on the floor of the car. She could not recall whether it was a credit card or business card.

¶ 13 Gustafson agreed that she was uncooperative with police when they first spoke to her a few days after the incident. She testified that she "loved *** and trusted" defendant, and that she still believed that Salamie had drawn a gun on him. She and defendant broke up in August or September 2007. After exchanging letters with defendant, Gustafson had begun to suspect "that

4

maybe it wasn't self-defense." Gustafson provided a new statement to police in early 2008. Gustafson had a child with defendant and did not want defendant in the child's life.

¶ 14 Gustafson began dating Matthew Benegas in October 2007. She discussed with Benegas everything that defendant had previously told her. Benegas encouraged Gustafson to talk to the police. On cross-examination, Gustafson agreed that she hated defendant, adding that he was a horrible person and had "no heart."

¶ 15 Defendant later called Gustafson in his case-in-chief. Gustafson recalled writing letters to defendant after he was arrested. She testified that in the letters sent after they broke up, she told defendant she hated him because he had no remorse for murdering Salamie. She also hated him because he lied to her frequently. Gustafson agreed that defendant had once punched a window in their trailer. She did not remember when that occurred or if defendant suffered any injuries. She remembered defendant telling her he had been in a fight with Larry White. She testified that this fight occurred before May 8, 2007. Gustafson originally told police that defendant told her he had been in a fight.

¶ 16 Jace Held testified that he met with defendant and Gustafson on May 12, 2007, in Bradley. Lindsey Reeves, the mother of Held's son, was also there. Reeves and Gustafson worked together. Defendant gave Held some money, which Held noticed to be sticky. The money had a substance on it that Held described as "red-brown," opining that it could have been red paint or blood. Held later spent the money. When asked on cross-examination why he accepted damaged money, Held replied: "Because that's the deal that went down. It didn't really bother me then."

¶ 17 Reeves also testified regarding the meeting with Held, Gustafson, and defendant. She testified that the meeting was arranged so Held could sell defendant cannabis. Reeves also

noticed a "red substance[ ]" on some of the money that defendant gave Held. She believed that defendant gave Held two bills, and the red substance was only on one of them.

¶ 18    Miguel Hurtado testified that he met defendant in December 2007, when they were in jail together in Will County. At the time, Hurtado was a ranking member in the Latin Kings gang and was in jail on a charge relating to a controlled substance. Hurtado testified that defendant told him that he had been paid by Salamie's ex-girlfriend to kill Salamie. Defendant described the murder to Hurtado: "[H]e said he cut him like a Thanksgiving turkey, and just all over the neck, and mainly around the neck. *** He says he is lucky he didn't cut his head off, but he said he sure tried." Hurtado testified that defendant told him the victim's name was Salamie. Defendant told Hurtado that he thought Salamie was dead and went to the bathroom to clean up. Defendant then noticed that Salamie was still alive and trying to flee. Defendant told Hurtado that he "chased [Salamie] back out the door outside and attacked him again, stabbing him."

¶ 19    Hurtado testified that defendant was concerned that his ex-girlfriend could be a witness against him. Defendant explained to Hurtado that she had seen him after the fact with blood on him. Defendant asked if Hurtado could "help him get rid of her." Hurtado clarified that defendant wanted his ex-girlfriend dead. He and defendant talked about a plan at length; defendant provided Hurtado with a piece of paper bearing Gustafson's name, address, and phone number. Defendant also provided three photographs of Gustafson so Hurtado could identify her. Hurtado turned over to a detective each of those items that defendant had provided, and the State submitted those items into evidence at trial.

¶ 20    Defendant also expressed concerns to Hurtado regarding potential cell phone and DNA evidence. He told Hurtado that he had stopped at a gas station to place a phone call following the attack. According to Hurtado, defendant was concerned that the phone call could establish his

6

whereabouts. Defendant was also concerned that he may have left DNA in the bathroom of Salamie's house.

¶ 21       At the time of trial, Hurtado was incarcerated in Texas, and had additional charges of forgery and possession of a controlled substance pending against him. Hurtado testified that his original charge of possession of a controlled substance, from 2007, was dropped when he came forward with information about his conversation with defendant.

¶ 22       Larry White testified that in May 2007, he lived in the St. Anne trailer park and knew defendant. White testified that one night he was engaged in an argument with his girlfriend, Teresa Mason. Defendant intervened in the argument, and White and defendant began to "wrestle[ ]" in the bedroom. Prior to his tussle with defendant, White had struck a mirror, resulting in a "gash" to his hand. He testified that he had dripped blood from that injury onto his carpet. White did not know the date of his altercation with defendant, other than it was summer.

¶ 23       Mason[2] testified that in May 2007, her son found a credit card on the ground at the St. Anne trailer park. Mason recognized the name on the card and called the police. She placed the credit card in a bag and turned the bag over to the police when they arrived.

¶ 24       On cross-examination, without objection, defendant questioned Mason regarding the altercation between she and White. Defendant referred to that altercation as having happened on May 8, 2007. Mason could not remember the date of the altercation, but added that "if that's the date that was on everything that I had put it on, yes." Mason recalled that White punched a mirror and was bleeding but could not remember how much blood there was. Defendant intervened and punched and wrestled with White. While Mason could not remember specifically

---

[2]At the time of defendant's trial, it appears that Teresa Mason was going by the name Teresa Mixon. For consistency, we will continue to refer to her as Teresa Mason.

7

if blood had gotten on defendant, she agreed that defendant "would have had to have blood on him."

¶ 25    Mason agreed that she originally told police that defendant did have blood on him following the altercation. She also agreed that in a statement to the police made days later, she said that there was not a lot of blood coming from White's injury and that defendant did not have any blood on him when he left her residence.

¶ 26    Stacy Manny testified that she also lived in the St. Anne trailer park in May 2007. She had a friendly relationship with defendant at that time. She recalled seeing defendant sometime after 7 a.m. on May 9, 2007. She was at her home with her friend, Julie Combs, when defendant knocked on her door. Defendant asked to borrow a tire iron from Manny. Manny testified that defendant was wearing a white sweatshirt with dark jeans. She observed that defendant's clothing was "splattered in blood on [his] right side."

¶ 27    Combs, who also lived in the St. Anne trailer park in May 2007, testified to the same events as Manny. Combs recalled defendant coming to the door of Manny's home. She testified that defendant had blood on his clothing, specifically on his stomach and knee areas.

¶ 28    Will County Sheriff's Deputy Michael Eriks conducted a search of defendant's blue Pontiac. In the center console he discovered a credit card with Salamie's name on it. The parties stipulated that the credit card was issued on January 25, 2007, and had never been activated. Edward Hayes of the Will County Sheriff's Department testified that on May 21, 2007, Mason gave him a credit card that she had found at the St. Anne trailer park. The credit card belonged to Salamie. Mason had contacted the department after she discovered the credit card. The parties stipulated that this credit card was active but had not been used by defendant. Hayes was recalled

8

in defendant's case-in-chief and testified that Gustafson told him in May 2007, that defendant had injured his hand punching a window on May 5, 2007.

¶ 29     Denise Powers, a detective with the Will County Sheriff's Department, spoke with defendant on May 11, 2007. She observed that defendant had several cuts on his right hand. Defendant claimed that he had received those injuries prior to May 8, 2007. Powers also originally interviewed Hurtado. She recalled that Hurtado told her that defendant told him he had "sliced [Salamie] like a turkey."

¶ 30     Dion Morrow, an analyst with Verizon Wireless, testified regarding defendant's cell phone records. A log of defendant's incoming and outgoing calls between May 7 and May 11, 2007, was submitted into evidence. Morrow explained that when a cell call is placed, it is routed through a cell tower, based on location and capacity. On average, cell towers have a range of three to five miles. The call log showed six cell calls placed from defendant's phone between 11:21 and 11:23 p.m. on May 8, 2007. Each of those calls was routed through a cell tower located on Egyptian Trail Road in Monee. No other calls in the log went through the same tower. The log contained more than 300 individual calls.

¶ 31     Subsequent calls placed on the morning of May 9, 2007, were routed through cell towers located in Bradley and, later, Bourbonnais. After a 12:26 a.m. call routed through the tower in Bourbonnais, almost all of the remaining calls on the log were routed through towers located in St. Anne.

¶ 32     The parties stipulated that the cell tower on Egyptian Trail Road was the closest cell tower to Salamie's house. The distance from defendant's home to Salamie's house was 30.2 miles, and took approximately 34 minutes to drive.

9

¶ 33        None of the latent fingerprints found by police at Salamie's house were matched to defendant, though 11 latent prints were deemed inconclusive. Testing on the substance found in the first-floor bathroom determined it was blood from multiple different profiles. Defendant could not be excluded from one of the profiles. None of the other DNA profiles found at Salamie's house were found to match or not exclude defendant.

¶ 34        Defendant called investigator Owen Beasley in his case-in-chief. Beasley created a map of the relevant region, showing Salamie's address as well as selected cell towers. Beasley testified regarding a number of potential routes from St. Anne to Salamie's address. Defendant subsequently submitted into evidence six sets of video surveillance footage collected from various businesses along these potential routes. The parties stipulated that defendant did not appear in any of the footage.

¶ 35        Wendy Martinez, defendant's aunt, testified that she was working as a cashier at a currency exchange in Bradley on May 9, 2007. She testified that defendant and Gustafson came into the currency exchange that day to pay bills. Gustafson gave Martinez cash. Martinez did not notice that any of the money had any stains on them. She was not allowed to accept damaged money.

¶ 36        Defendant's mother, Mary Ayala, testified that she sold the blue Pontiac to Gustafson and defendant. She borrowed the car regularly. She remembered seeing a credit card in the ashtray of the car. The credit card had a name, "Joseph something" on it. Ayala did not remember when she had seen the credit card, but knew it was before she spoke with detectives in this case.

¶ 37        By stipulation, the parties agreed that Cletus Guynn would testify that he lived in the St. Anne trailer park in May 2007. He would testify that he saw defendant on May 8, 2007, between 8 and 9 p.m. Defendant was "covered in blood" and it appeared he had "smeared blood all over

10

himself and his shirt." When Guynn asked defendant about the blood, defendant only responded, "never you mind."

¶ 38    Defendant rested and the case proceeded to closing arguments. After initial arguments, the State, in rebuttal, argued in part:

> "[Salamie] died a gruesome death. He bled out from a hundred and eleven wounds. He knew what was happening the whole time. He tried desperately to escape knowing what was happening in his own home. Only to be re attacked and left for dead.
>
> This defendant *** is a true psychopath. After he did this to somebody he knew, just for cash, he walked around wearing the bloody clothes, as if daring somebody to do something about it. He bragged to [Gustafson]. He flaunted his bloody clothes. He tossed around the victim's credit cards. And he simply showed no remorse, just like [Gustafson] said. Even once he was arrested he flaunted it. He bragged to Hurtado all about it. Isn't he cool? He sliced up this victim like a turkey. That's really funny to him. He's been daring everybody to convict him of his offense—of this offense. That is your job. Find him guilty of each and every count."

¶ 39    The jury found defendant guilty of armed robbery and three theories of first degree murder. It found him not guilty of home invasion and felony murder based on home invasion. The court sentenced defendant to terms of 24 years' and 7 years' imprisonment for first degree murder and armed robbery, respectively, with those sentences to be served consecutively.

¶ 40                                    II. ANALYSIS

11

¶ 41        On appeal, defendant argues that the prosecutor committed prosecutorial misconduct in its rebuttal argument by asserting facts not in evidence or misstating the evidence. He also argues that the circuit court erred in admonishing the venire during the jury selection process, and that the error is reversible under the plain error doctrine because the evidence at trial was closely balanced. We address each argument in turn.

¶ 42                                A. Prosecutorial Misconduct

¶ 43        Prosecutors have wide latitude in the content of their closing arguments. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). The prosecutor may remark on the evidence and any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). When supported by the evidence, a prosecutor may comment unfavorably on the defendant and his crime. *People v. Jackson*, 84 Ill. 2d 350, 360 (1981). The prosecutor may also remark upon matters of common knowledge or experience. *People v. Runge*, 234 Ill. 2d 68, 146 (2009). "[T]he mere use of strong language does not rise to the level of prosecutorial misconduct." *People v. Schlott*, 2019 IL App (3d) 160281, ¶ 54. The prosecutor may not, however, misstate facts or argue facts or assumptions not supported by the evidence at trial. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 44        Defendant's argument that the prosecutor committed prosecutorial misconduct in closing arguments stems solely from a single paragraph found in the State's rebuttal:

> "This defendant *** is a true psychopath. After he did this to somebody he knew, just for cash, he walked around wearing the bloody clothes, as if daring somebody to do something about it. He bragged to [Gustafson]. He flaunted his bloody clothes. He tossed around the victim's credit cards. And he simply showed no remorse, just like [Gustafson] said. Even once he was arrested he flaunted it.

12

He bragged to Hurtado all about it. Isn't he cool? He sliced up this victim like a turkey. That's really funny to him. He's been daring everybody to convict him of his offense—of this offense. That is your job. Find him guilty of each and every count."

Within that excerpt, defendant identifies a number of comments that purportedly amount to assertions not supported by the evidence or misstatements of the evidence.

¶ 45                                     i. "True Psychopath"

¶ 46        First, defendant argues that the prosecutor's characterization of him as a "true psychopath" "was a blatant assertion of a fact not in evidence." He points out that psychopathy is "an actual mental health diagnosis" and that no such evidence about defendant was presented at trial.

¶ 47        Defendant's literal interpretation of the prosecutor's comment is untenable. It is clear to us that the term "psychopath" was not being used here in a strictly psychiatric or medical manner. The prosecutor's comment cannot reasonably be construed as an effort to assert the fact that defendant had been diagnosed with or otherwise suffered from the disease of psychopathy. It is extremely unlikely that the jury would interpret the comment in such a way.

¶ 48        Rather, it is apparent that the prosecutor meant the term in its common parlance, referring to a person who engages in extremely amoral behavior. In this sense, the State's remark is seen as a comment on the particular heinousness of the crime with which defendant had been charged. Indeed, the prosecutor's comment followed immediately after her description of Salamie's "gruesome" death, a characterization plainly supported by the evidence. We find that the characterization was well within the wide latitude provided in closing arguments. See *Evans*, 209 Ill. 2d at 225.

13

¶ 49                                    ii. Bragging to Gustafson

¶ 50       Defendant next takes exception to the prosecutor's comment that defendant "bragged to [Gustafson]." He maintains that "the evidence did not show that [defendant] had boasted to her about anything related to the offense." He also urges that "[i]t is important to note that Gustafson's testimony was impeached" by her prior statements to the police.

¶ 51       Gustafson testified that defendant came home covered in blood and explained to her exactly how he had murdered Salamie. Gustafson testified that defendant told her that he stabbed Salamie 200 times and chased him around the house and outside, continuing to stab him "because he wouldn't die." Defendant told her that he eventually "ripped [Salamie's] throat out." This testimony was in evidence, regardless of whether impeachment evidence against Gustafson was offered as well.

¶ 52       Gustafson's testimony does not portray a person who was modest or ashamed of the murder committed. Instead, it depicts defendant as willing to discuss what he had done, including, apparently, embellishing his story for effect by telling Gustafson he had stabbed Salamie 200 times and "ripped his throat out." Given Gustafson's testimony, we cannot say that the prosecutor's use of the term "bragged" to describe defendant's conduct was a misstatement of evidence, where such a description is a reasonable and fair interpretation of the evidence presented at trial. See *Nicholas*, 218 Ill. 2d at 121.

¶ 53                                    iii. "Flaunting" and "Daring"

¶ 54       Next, defendant alleges that the prosecutor erred in arguing that defendant "flaunted his bloody clothes" and "walked around wearing the bloody clothes, as if daring somebody to do something about it." He argues that these comments were "overt distortion[s] of the testimony presented to the jury."

14

¶ 55      Gustafson testified that defendant came home on the night of May 8, 2007, with "blood all over his clothes." Moreover, both Manny and Combs testified that defendant appeared at Manny's home on the morning of May 9, 2007, with blood visible on his clothing. Defendant had knocked on Manny's door to ask if he could borrow a tire iron. This evidence depicts defendant as not being particularly concerned with hiding the blood on his clothing.

¶ 56      Defendant asserts that "there was no indication that [defendant] had flaunted his stained clothing" to either Manny or Combs. Defendant's argument again suffers from an unnecessarily literal interpretation of the terms employed by the prosecutor. The evidence showed that defendant wore blood-covered clothing in public and in a face-to-face encounter with people who knew who he was. The blood-covered clothing was, by all accounts, conspicuous, with defendant having made no apparent effort to cover it up. Describing such behavior as "flaunt[ing]" is a fair and reasonable characterization. *Id.*

¶ 57      Further, while the defendant did not, literally, dare any person to "do something about" his clothing, we note that the prosecutor instead commented that defendant was wearing the bloody clothes openly "*as if* daring somebody to do something about it." (Emphasis added.) Thus, defendant's literal interpretation of the comment is undermined where the prosecutor made clear that she was *not* speaking literally. Rather than speaking of an actual dare, the prosecutor was only commenting on the apparent lack of concern defendant showed for incriminating himself or being implicated in Salamie's murder. Once again, we find that such a remark was well within the wide latitude provided in closing argument. *Evans*, 209 Ill. 2d at 225.

¶ 58      Defendant also argues that evidence from White, Mason, and Guynn raised the possibility that the blood on defendant's clothing originated in a fight with White, rather than in the charged offense. Those facts, however, are irrelevant to defendant's prosecutorial misconduct argument.

15

Our only inquiry is whether the prosecutor's remarks were supported by trial evidence. See *Glasper*, 234 Ill. 2d at 204. We have found that the remarks in question were supported by the testimony of Manny, Combs, and Gustafson. We are unaware of any court that has assigned error to the State for failing to recount every piece of trial evidence in closing argument. While the evidence presented by White, Mason, and Guynn might tend to undermine the credibility of Manny, Combs, and Gustafson, it does not negate the very existence of that evidence.

¶ 59                                    B. Rule 431(b)

¶ 60        Defendant argues that the circuit court committed error in admonishing the venire during jury selection. Specifically, he contends that the court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant concedes that he failed to preserve the issue, and requests that we review his claim under the rubric of plain error.

¶ 61        The first step in any plain error analysis is to determine whether a clear, obvious, or plain error has been committed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). If the reviewing court finds that a clear or obvious error has occurred, it is the defendant's burden to demonstrate that the error was prejudicial and thus reversible. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Generally, a defendant can make this showing under the first or second prong of plain error. *E.g.*, *People v. Darr*, 2018 IL App (3d) 150562, ¶¶ 49-50. In this case, defendant only argues that the error was reversible because the evidence was closely balanced under the first prong of the plain error test. See *People v. Belknap*, 2014 IL 117094, ¶ 48; see also *People v. Sebby*, 2017 IL 119445, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury.").

¶ 62        Rule 431(b) requires the circuit court to ask each potential juror whether the juror "understands and accepts" a number of fundamental legal principles. Ill. S. Ct. R. 431(b) (eff.

16

July 1, 2012). In the present case, with respect to some of those principles, the circuit court asked only if the potential jurors understood. The State concedes that the court committed error. We find that the court committed clear and obvious error. See *People v. Wilmington*, 2013 IL 112938, ¶ 32.

¶ 63 Next, we must consider whether the evidence at defendant's trial was closely balanced, such that the circuit court's Rule 431(b) violation would be reversible. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Applying such an assessment in the present case, we find that the evidence at defendant's trial was not closely balanced. On the contrary, the evidence against defendant was overwhelming.

¶ 64 Gustafson testified that the night of Salamie's death, defendant came home and confessed to the killing. She saw that he was covered in blood. Gustafson testified that defendant had Salamie's wallet and $1200 with blood on it. She recalled seeing a card with Salamie's name on it in the blue Pontiac that she and defendant drove. Gustafson's testimony was corroborated by Held and Reeves, who each testified that defendant paid for cannabis with money containing red or reddish-brown stains. Gustafson's testimony was further corroborated by testimony that police found Salamie's credit card in the blue Pontiac. A second credit card belonging to Salamie was later found in the trailer park where defendant lived. The State also presented testimony from defendant's neighbors in the St. Anne trailer park, Manny and Combs, who each saw defendant with blood on his clothing the morning after Salamie's murder.

¶ 65 Hurtado also testified that defendant confessed to Salamie's murder. Hurtado further testified that defendant indicated to him that Gustafson could be a witness against him in the

murder case. Defendant provided Hurtado with a piece of paper bearing Gustafson's identifying information, as well as three photographs of Gustafson, all designed to help Hurtado "get rid of" Gustafson. Hurtado turned over the paper and three photographs to investigators, and those items were submitted into evidence at trial.

¶ 66 Finally, the State presented evidence of defendant's cell phone activity. This evidence established that between 11:21 and 11:23 p.m. on the night of May 8, 2007, defendant placed six phone calls that were routed through the cell tower nearest to Salamie's house. Salamie was estimated to have died between 10:21 that night—when the last call from his phone was made— and 9 the following morning. Within a half hour, defendant's phone calls were being directed through a cell tower in St. Anne, where he lived.

¶ 67 As defendant argues, none of the State's evidence is unassailable. Gustafson's testimony was markedly different from her earliest statements to police, and her hatred for defendant ostensibly provides motivation to be untruthful. Hurtado's testimony as a jailhouse informant, who had his own criminal charge dropped because of his cooperation in this case, should be treated with caution. See *People v. Williams*, 65 Ill. 2d 258, 267 (1976). Defendant's cell phone records establish, at most, that defendant was in the very general vicinity of Salamie's home in the general timeframe in which Salamie died.

¶ 68 Gustafson's original statements to police, however, were made while she was still in a relationship with and loved defendant. Statements made in that context would seem inherently less credible than in the context in which she provided her trial testimony. See *Sebby*, 2017 IL 119445, ¶ 53 (commonsense assessment of evidence includes consideration of credibility of witnesses). Moreover, Gustafson's testimony was corroborated by, and her credibility therefore bolstered by, testimony from Held, Reeves, Manny, and Combs, as well as physical evidence in

18

the case. Further, while Hurtado did receive a benefit for his cooperation, he was the rare jailhouse informant who was actually able to produce receipts of his conversation. That Hurtado was able to give investigators the items defendant had given him to identify Gustafson strongly bolsters his credibility. Additionally, our supreme court has cautioned that, in the context of a closely balanced analysis, "the testimony of jailhouse informants is not to be viewed as inherently unbelievable." *Belknap*, 2014 IL 117094, ¶ 55.

¶ 69      Other incriminating evidence presented at defendant's trial is less susceptible to an alternative explanation. Both Manny and Combs, for example, testified that they saw defendant wearing blood-stained clothing the morning after Salamie's murder. Defendant attempted to explain these observations by establishing that he had gotten White's blood on himself during an altercation the previous night. But neither White nor Mason could testify to the date of that altercation. White believed it happened in the summer. Mason did not remember the date, but merely accepted defendant's implication that she had previously stated it was on May 8, 2007. Further, Mason, having no readily apparent reason to be untruthful, gave conflicting statements to police in the days immediately following Salamie's murder, including a statement that defendant had no blood on him following the altercation with White. In short, the uncertain testimony from White and Mason failed to undermine the clear and consistent testimony provided by Manny and Combs.

¶ 70      Similarly, defendant attempted to impeach Held's and Reeves's testimony regarding the blood-stained currency with his aunt's testimony. Specifically, Martinez testified that the day after Salamie's murder, defendant and Gustafson paid bills at the currency exchange, but that they did not pay with blood-stained money. Of course, the testimony of defendant's family member is immediately subject to credibility concerns. Moreover, if the money had been stolen

19

from Salamie in the course of the murder and came to have Salamie's blood on it, it would seem unlikely that *every bill* would be stained with blood. Indeed, Gustafson never testified specifically that the money used to pay the bill had blood on it.

¶ 71    Innocent explanations of the State's physical evidence also strain credulity. Police found one of Salamie's credit cards in defendant's car, and another in the trailer park where he lived. While defendant's mother testified that she had previously seen the credit card in the car, she did not testify as to when, other than that it was before she spoke with police. Thus, in addition to Ayala's palpable credibility issues, her testimony did not establish that defendant had previously acquired the card. Further, while the discovery of Salamie's credit card on the ground at the St. Anne trailer park does not point directly to defendant, it is highly probative in the context of the remainder of the State's evidence. Similarly, the evidence of defendant's cell calls, while plainly not *directly* incriminating, is strong circumstantial evidence, especially when considered in conjunction with the State's other evidence. While it was stipulated that defendant was not seen on the collected surveillance footage, that evidence, at most, impacts Hurtado's credibility. The cell call log strictly established that defendant was in the vicinity of Salamie's home around the time of his death.

¶ 72    To be sure, the State was unable to produce a smoking gun. There was no fingerprint or conclusive DNA evidence establishing that defendant was in Salamie's house. Accordingly, defendant argues that both Gustafson and Hurtado perjured themselves at trial. He argues that his presence in the area of Salamie's house the night of his murder could have been coincidence, or he could simply have been driving through. He argues that he could have "come to possess" Salamie's credit cards well before Salamie's death. He argues that his clothes became blood-

20

stained in his fight with White. He argues that the jury could have chosen to believe Ayala over Held and Reeves regarding the blood-stained money.

¶ 73    To accept each and every one of defendant's arguments would belie a "commonsense assessment" of the evidence. *Sebby*, 2017 IL 119445, ¶ 53. The State presented an abundance of evidence against defendant. While defendant attempts to explain away each individual piece of evidence—with varying levels of plausibility—the totality of the evidence leads to the unavoidable conclusion that defendant murdered Salamie. We find that the evidence in defendant's case was not closely balanced, and that he is therefore entitled to no relief stemming from the circuit court's unpreserved Rule 431(b) violation.

¶ 74                                    III. CONCLUSION

¶ 75    The judgment of the circuit court of Will County is affirmed.

¶ 76    Affirmed.

¶ 77    JUSTICE McDADE, dissenting:

¶ 78    Ordinarily, this separate opinion would be a special concurrence because it seems clear there was ample evidence to affirm defendant's conviction. It is instead a dissent because I believe the prosecutor's challenged statements are of such a kind and character that they, rather than the proven facts, may have actually driven the outcome.

¶ 79    The majority has recited the applicable law of alleged prosecutorial misconduct (*supra* ¶ 43) as articulated by the supreme court. The prosecutor may remark on the evidence or reasonable and fair inferences derived from that evidence, even if it reflects negatively on the defendant. *Nicholas*, 218 Ill. 2d at 121. A prosecutor may comment unfavorably on the defendant or his crime, but only if supported by the evidence. *Jackson*, 84 Ill. 2d at 360. The prosecutor may remark on matters of common knowledge or experience. *Runge*, 234 Ill. 2d at 146. The

21

prosecutor *may not*, however, misstate facts or argue facts or assumptions not supported by the evidence at trial. *Glasper*, 234 Ill. 2d at 204. "A prosecutor cannot use closing argument simply to 'inflame the passions or develop the prejudices of the jury without throwing any light upon the issues.' " *People v. Wheeler*, 226 Ill. 2d 92, 128-29 (2007) (quoting *People v. Halteman*, 10 Ill. 2d 74, 84 (1956)). When I apply those principles to the State's closing argument in this case, I reach a very different conclusion than that reached by the majority.

¶ 80        The State presented no competent evidence that defendant was actually a psychopath. While the majority insists that the prosecutor did not use the term "psychopath" in a literal, medical sense, the use of that term was nevertheless a clear invitation for the jury to draw inferences about defendant consistent with a juror's understanding of what a "psychopath" is. Whether a juror determined defendant to be a psychopath—in any sense of the word—is not specifically relevant to the determination of guilt or innocence. Rather, the effect of such commentary is to deflect the jurors' attention away from the facts and in the direction of speculation. This same deflection occurs when the State urges the jury to conclude that defendant's actions are a result of braggadocio and brazenness without admitting the possibility that they may have been due to mental or psychological challenges.

¶ 81        The prosecutor's expansive rhetoric portrayed defendant as a dangerous, unstable person, wholly unmoved by the heinous crime he had committed. Even if, as the majority finds, those inferences may be supported by some evidence, the argument is *still* improper. Painting defendant as a dangerous, brazen psychopath is not an argument that he is actually guilty of the charged offense. Questions of caring or remorse are within the province of the sentencing court, not the trial jury. The State's argument was designed solely to inflame the passions of the jury and invite the jury to find defendant guilty on improper grounds. *Id.* at 128-29. The improper

22

argument was especially damaging to defendant because it occurred in the State's rebuttal, providing no opportunity for defendant to refute the argument and direct the jury's attention back to the actual question of guilt or innocence. See *People v. Legore*, 2013 IL App (2d) 111038, ¶ 55. Due to the likelihood that the State's inflammatory rebuttal argument was a material factor in defendant's convictions, I would vacate his convictions and remand for a new trial. *Wheeler*, 226 Ill. 2d at 123.