NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 190323-U

NO. 4-19-0323

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| DEONTA O. JOHNSON, | ) | No. 09CF1471 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) Defendant was not denied the effective assistance of counsel when trial counsel failed to impeach two witnesses.

(2) The prosecutor's comments during closing argument were not improper and did not deny defendant his right to a fair trial.

(3) Defendant's *de facto* life sentence is not unconstitutional.

(4) Defendant was not denied the effective assistance of counsel at sentencing when trial counsel did not introduce allegedly mitigating evidence.

¶ 2     In October 2018, a jury found defendant, Deonta O. Johnson, guilty of the August 24, 2009, first degree murder of Jerry Newingham (720 ILCS 5/9-1(a)(1) (West 2008)) and attempted first degree murder of Kevin Wilson (*id.* § 8-4(a), 9-1(a)(1)). Defendant, born August 12, 1995, was sentenced to consecutive prison terms totaling 45 years. Defendant appeals his

convictions and sentence.

¶ 3        On appeal, defendant argues (1) he is entitled to a new sentencing hearing because (a) the trial court erroneously found him permanently incorrigible, (b) the court failed to properly consider youth and its attendant circumstances before sentencing him to a *de facto* life sentence, and (c) his counsel was ineffective for failing to produce evidence establishing his potential for rehabilitation; (2) he was denied the effective assistance of counsel due to counsel's failure to impeach two of the State's key witnesses; and (3) the State's inflammatory and improper closing argument deprived him a fair trial. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On August 24, 2009, Jerry Newingham was riding his bicycle when he encountered a group of teenage boys near the Monroe Quick Stop near Sawyer Street in Decatur, Illinois. One of the assailants struck Newingham, causing him to fall to the ground. The group surrounded Newingham, and some kicked him and stomped on him. Newingham died from his injuries. A short time later, the group encountered Brian Wilson, who was under a pavilion in Garfield Park, and attacked him. When he was found by emergency personnel, Wilson was bloody and swollen and unable to answer questions or walk. Wilson survived the attack.

¶ 6        On September 16, 2009, the State charged defendant's half-brother Elliot Murphy (born April 5, 1993), Malcom Spence (born October 13, 1992), twins Dedrick and Fredrick Rhone (born August 29, 1993), and Branden White (born November 6, 1993) with first degree murder and mob action in relation to Newingham's attack. Regarding the Wilson attack, the State charged the teens with attempted first degree murder, mob action, aggravated battery, and robbery. By a delinquency petition, the State asserted the same charges against defendant. Upon the State's motion, defendant was transferred to adult court.

¶ 7          Pleas were entered by all charged, except by defendant and Murphy. Pursuant to a negotiated plea, Spence pled guilty to mob action and obstruction of justice and agreed to testify truthfully. White entered a negotiated plea to first degree murder, and pursuant to that agreement, he was sentenced to 20 years and agreed to testify truthfully. The Rhone twins entered open pleas: Fredrick was sentenced to 20 years for murder, and Dedrick was sentenced to an unspecified term for the attempted murder of Wilson.

¶ 8          Defendant and Murphy elected to be tried by a jury. In 2011, defendant and Murphy were tried jointly and found guilty of murder and attempted murder. This court reversed defendant's convictions upon finding the trial court, before transferring defendant to adult court, failed to consider evidence regarding the juvenile-detention facilities and the available services within those facilities as required by statute. See *People v. Johnson*, 2013 IL App (4th) 111007-U, ¶ 3.

¶ 9          On remand, after a new transfer hearing, defendant was again transferred to adult court.

¶ 10                    A. Defendant's Second Trial

¶ 11          Defendant's second trial was held in October 2018. Many witnesses testified at the trial, but most testified they did not recall who participated in the attacks and to what extent. We include summaries of the testimony relevant to the issues raised on appeal.

¶ 12          The testimony established, on August 24, 2009, around 3 p.m., a group of junior-high and high-school students gathered after school at Garfield Park to watch a fight between Cedrick Rhone, Dedrick and Fredrick's brother, and Brian Armour. Those who gathered to watch included defendant, Murphy, Spence, White, Fredrick, Dedrick, Martin Wheeler, and brothers Martez and Allen Hill. After the fight, Cedrick testified the group "walked to go fight

[Armour] again." On Sawyer Street, the group encountered Newingham. Cedrick was asked if he recalled testifying at the first trial defendant punched Newingham and knocked him from his bike; Cedrick testified he did not. Cedrick was also asked if he told the police on September 15, 2009, that defendant, upon seeing Newingham, asked his older brother, "should I knock him out." Cedrick did not remember. Cedrick also did not recall telling the police defendant "just wanted to prove he had balls or something."

¶ 13        After the attack on Newingham, the group dispersed. One witness, who resided in the neighborhood where the Newingham attack occurred, testified, somewhere between 3:30 and 4 p.m. on August 24, 2009, she was outside when she heard screaming and yelling for a few minutes. She then observed six to eight boys running down the street, "[l]ike skipping, giving each other high fives, laughing." Two other witnesses testified, around 4 p.m. that day, they observed "a bunch of kids" or "teenagers" running and yelling "we knocked him out" or "[w]e just knocked his ass out."

¶ 14        Newingham lost consciousness before emergency responders arrived. He was found tangled in his bicycle. Newingham suffered brain trauma, facial injuries, broken facial bones, broken ribs, and contusions on his lungs. He died 12 days after the attack.

¶ 15        The witnesses testified to multiple versions of the attack on Wilson. One witness testified the attack began when one male arrived, poured water on Wilson, and struck him with a soda can. At that point, defendant, Murphy, and "at least ten people" attacked Wilson at once. She believed the entire group participated but could not state which person did what to Wilson. Another witness recalled telling the police defendant and Murphy were the primary instigators. Dedrick testified defendant did not participate in beating Wilson.

¶ 16        Emergency workers found Wilson lying on the ground and surrounded by

approximately 20 to 30 teenagers. "Quite a bit" of blood was near Wilson's head. Wilson suffered facial trauma; facial fractures on the cheekbones, eye sockets, and maxillary sinuses; lacerations; and a mild-to-moderate brain injury. Wilson was discharged from Decatur Memorial Hospital on September 8, 2009, and he spent 10 additional days in St. Mary's Hospital for rehabilitation.

¶ 17        The State entered a stipulation into evidence regarding DNA evidence. Among the items tested were Murphy's size 11.5 shoes and defendant's size 7 shoes. A bloodstain a quarter of an inch to one inch in size was found inside the treads of defendant's left shoe. DNA testing on the stain was inconclusive.

¶ 18                            1. *Martin Wheeler's Testimony*

¶ 19        Martin Wheeler, age 15 when the attacks occurred, testified, after school on August 24, 2009, he was at Garfield Park playing basketball. White, Cedrick, Dedrick, Murphy, defendant, "Allen and Tez," and Spence were there. Wheeler observed the attack on Newingham. Both Murphy and defendant hit Newingham, but Wheeler did not recall who struck Newingham first. After Newingham fell to the ground, Murphy, defendant, Cedrick, and Dedrick stomped on Newingham. Defendant stomped on Newingham "[f]our or something" times. Murphy stomped on him "[l]ike eight" times. Wheeler did not remember how many times Dedrick and Cedrick stomped on Newingham.

¶ 20        When Wheeler was asked if he remembered being interviewed by Detective Hitchens on September 22, 2009, Wheeler testified he did. Wheeler recalled telling the detective defendant crossed the street and knocked Newingham off his bike, but he could not remember on the date of his testimony who first struck Newingham. At defendant's first trial, Wheeler initially testified Newingham was riding his bike while looking down. When asked what happened next,

Wheeler testified Murphy hit Newingham. A few questions later, upon being asked, "[a]s you sit here today, who[m] do you recall hitting [the man] first," Wheeler responded he thought defendant struck him first.

¶ 21　　　　Wheeler also testified regarding the attack on Wilson. According to Wheeler, both defendant and Murphy struck Wilson. Wheeler thought defendant was the first to attack Wilson. When Wilson was on the ground, defendant, Murphy, Dedrick, and Fredrick stomped on the man. Wheeler testified he attempted to wake Wilson by pouring water on his face.

¶ 22　　　　On cross-examination, Wheeler agreed he "previously testified [he did not] remember who made that first hit." When asked where he was standing when the attack on Newingham occurred, Wheeler said he was "[a]cross the street." Wheeler testified he did not know either Murphy or defendant personally; he just knew their names. The group who attacked Newingham surrounded him. Defense counsel asked "from across the street how certain are you that you could really see, individually, who was doing what, especially considering you didn't know two of these people?" Wheeler responded, "They were right in front of me," about 20 feet away. There was an unspecified number of people next to him watching as well.

¶ 23　　　　Regarding the attack under the pavilion, Wheeler was approximately 15 feet away. Wheeler testified he was not charged with any offenses related to the attacks.

¶ 24　　　　　　　　　　2. *Malcolm Spence's Testimony*

¶ 25　　　　Malcolm Spence, 16 years old at the time of the August 2009 attacks, identified defendant in the group that attacked Wilson. Spence identified Murphy, defendant, Fredrick, Dedrick, and White as being in the group, but he could not tell which individual did what during the attack. The State introduced testimony from the first trial, in which Spence testified he saw defendant kick and stomp Wilson. Spence was asked if he remembered testifying at Murphy's

- 6 -

trial regarding a conversation with Murphy two days after the attacks. Spence did not recall. When Spence was asked if he remembered being asked, "Did Elliott Murphy tell you what he said to his brother?" and giving the answer, "Yes. He said he told him to punch him," Spence said he did not remember.

¶ 26 At the start of Spence's testimony, the prosecutor questioned Spence regarding his criminal history. Spence testified he had convictions for theft and residential burglary in 2007. Related to the attacks on Newingham and Wilson, Spence had been charged with first degree murder, aggravated battery, and robbery, but those charges were dismissed in exchange for a guilty plea to mob action and obstruction of justice and an agreement to testify truthfully. Spence further testified he was arrested in February 2017 for domestic battery. He agreed no charges were filed. Spence also testified he was serving a sentence in the county jail, which would be followed with 30 months' probation, for possession of a controlled substance and aggravated fleeing.

¶ 27                                    3. *Closing Argument*

¶ 28 During closing argument, the prosecutor made the following statements:

"And finally, we have, as a piece of physical evidence, we have this defendant's left shoe that was collected by the Decatur Police Department from this defendant's foot. This shoe was sent to the crime lab. And the crimes lab examined the bottom of this left shoe and it was visible, you can read from our stipulation, a red stain that was a quarter inch to an inch in size underneath the treads of this shoe. And you can see the crime lab markings on the bottom of this shoe. That stain was swabbed. And it was tested and

it tested positive for blood. This was nine days after the attack that this shoe was collected by Detective Hitchens.

And I submit if all of you looked at your shoes right now nobody's got blood on the bottom of their shoes. But this defendant did, nine days after *** these two innocent men were attacked. *** [T]his is physical evidence that corroborates that[,] as all of our witnesses said, this defendant actively participated and stomped on these men as they laid there bleeding. And that's why blood is on the bottom of his shoe."

¶ 29   The prosecutor emphasized nine years had passed since the men were attacked and justice in the case had been delayed. The prosecutor asked "that you not let it be denied" and "find this defendant guilty and hold him accountable for the actions that he took and the conscious choices that he made" in August 2009.

¶ 30   The jury found defendant guilty.

¶ 31                                B. Sentencing

¶ 32   Defendant's sentencing hearing was held in March 2019. At the start of that hearing, the trial court took judicial notice of the initial sentencing hearing held in September 2011.

¶ 33                    1. *Defendant's September 2011 Sentencing*

¶ 34   At the 2011 sentencing hearing, the State introduced testimony from Stephanie Lawson, a day-shift supervisor at the Sangamon County Juvenile Detention Center (Detention Center). Lawson testified, on April 5, 2010, defendant and another minor engaged in a "fist fight." Defendant "[f]ought back," striking the minor in the head multiple times. As staff

- 8 -

attempted to intervene, defendant resisted. Defendant also took a pen from an intervening officer. On March 1, 2011, two minors were fighting when defendant intervened. Defendant injured one of the minors and the staff member who was attempting to break up the fight.

¶ 35    Patrick Moore, a treatment specialist at the Detention Center, testified, in September 2010, defendant and another minor, while playing cards, stood from the table and began punching a third minor. The attacked minor fell to the ground, while defendant and the other attacker kicked and stomped on him. Moore restrained defendant as two treatment specialists arrived to restrain the other minor. While restrained, defendant continued to yell and resist. Moore could not say whether the attack was provoked.

¶ 36    Tim Loyd, a treatment specialist at the Detention Center, testified, on July 6, 2010, he observed defendant pick up a pencil sharpener and throw it at a teacher. Defendant was directed to return to his room, but defendant refused saying, "You're gonna have to slam me."

¶ 37    Blake Schulenburg, a treatment specialist, testified a pen was confiscated from defendant's pod on May 11, 2010. On December 19, 2010, Schulenburg was discussing goals with defendant when he reacted by ripping up his goal sheet. Defendant then pulled down the curtains and threw pod chairs. Defendant continued to resist as Schulenburg placed him in a combat clinch and took him to the ground.

¶ 38    On behalf of defendant, Cynthia Hunt, a school psychologist with the Macon Piatt Special Education District, testified she prepared a January 2009 psychological report after evaluating defendant to determine his eligibility for special-education services. At that time, defendant was attending seventh grade at Stephan Decatur Middle School. Defendant's intelligence quotient (IQ) was 63, significantly below average. He was in the first percentile for a child his age. According to Hunt's testimony, under the Disabilities and Education Act,

defendant had the disability of "[m]ental [r]etardation" as he had an IQ under 70. Hunt also gave defendant an achievement test, which indicated defendant was functioning at a first- to third-grade level in reading and at a third- to fourth-grade level in mathematics. Hunt opined, as of completing high school, defendant would function at a fourth- to sixth-grade level.

¶ 39 Defendant's mother, Shonda Horges, testified defendant was embarrassed at school for receiving special-education classes. He demonstrated "a lot of frustration." Defendant was teased by students. He would walk out of class. At home, defendant got along with his siblings and followed the rules.

¶ 40 Evidence established defendant smoked marijuana since age 11. When he was 9 or 10 years old, he was charged with throwing rocks at a moving vehicle. Defendant also was charged with trespassing at school when he was once waiting for his mother to pick him up.

¶ 41 2. *Additional Evidence at the March 2019 Sentencing Hearing*

¶ 42 The State called one witness to testify, Ronald Atkins, a sergeant with the sheriff's office. According to Sergeant Atkins, on January 16, 2016, officers responded to a complaint of theft and battery from an inmate. According to the complainant, defendant and another inmate entered the complainant's cell with a sheet or towel. The complainant reported defendant and the other inmate put the sheet or towel on the bed and began taking his property. The complainant approached the two, who started to strike the complainant's face. After the complainant backed off, defendant and the other inmate took socks and other commissary items and left the cell. Defendant was later found wearing socks that matched complainant's description. Charges remained pending.

¶ 43 On cross-examination, Sergeant Atkins agreed the socks matched those sold at the commissary. Sergeant Atkins could not say whether defendant was wearing complainant's socks.

Sergeant Atkins testified the video surveillance of the complainant's cell shows defendant leaving the cell and the complainant striking out at him. Sergeant Atkins testified on redirect examination the video shows defendant left the cell with a white object in his hand that appeared to be socks.

¶ 44    In mitigation, defendant entered a letter dated September 1, 2014, from Ray Wallace, a retired superintendent of programs with the Department of Juvenile Justice. According to the letter, Wallace retired as of December 31, 2013, after working over 30 years in juvenile corrections. Wallace wrote: "In all of my years, I was most impressed how [defendant] carried himself. He was quiet, but always respectful, and applied himself in both work details and in our Education programs. I was present at his GED graduation and was very proud of him." Wallace further stated "he continued to be a role model and he encouraged other youth to make the best of their time and be successful."

¶ 45    In allocution, defendant simply said the following: "Just—let the Court know I'm sorry. I do apologize to the family. Let them know I'm sorry. And that'd be about it."

¶ 46                                    3. *Sentence*

¶ 47    The trial court stated the following before sentencing defendant to consecutive terms of 30 years' imprisonment for murder and 15 years for attempted murder:

"I have considered the statutory factors in aggravation and mitigation. I've even reviewed the *Holman* case from the Supreme Court dealing with Juvenile factors that you do have to take a look at.

First of all, as I look at factors in mitigation, as I have stated, you have to take into consideration the defendant's age at

- 11 -

the time. He was 14. It's clear from the record that he did have mental deficiencies. And that, once again, is something the Court does take into consideration.

There is some evidence that his actions were influenced by others. And, once again, that would be his brother, Elliott Murphy so, I do take that into consideration. The defendant has apologized here today. And there's evidence that he has received his GED ***. That is something the Court, once again, takes a look at in factors of aggravation. Although he was a very young age, it's clear that he should have known these actions could not be tolerated. We don't have just one victim in this case[,] we have two victims. There is nothing to justify these random acts of violence.

We have two victims in this matter that were completely innocent. It's extremely brutal actions on the part of [defendant] and the others that were involved in this case. The Court certainly has a lot of trouble with the actions that were taken in this.

The people of Macon County have a right to be protected from such actions as this. It's clear that a sentence to the Department of Corrections is necessary in this case."

¶ 48                    C. Motion to Reconsider Sentence

¶ 49        On April 2, 2019, defendant filed his motion to reconsider sentence. In his motion, defendant argued, in part, the trial court failed to give adequate weight to his age at the time of the offense. On April 29, 2019, defendant filed an amended motion to reconsider

- 12 -

sentence, arguing, in part, the April 18, 2019, decision in *People v. Buffer*, 2019 IL 122327, ¶¶ 40-42, 137 N.E.3d 763, establishes his 45-year sentence was an unconstitutional *de facto* life sentence as the offense does not reflect "irreparable corruption."

¶ 50 At the May 2019 hearing on the motion, defendant highlighted the "mob mentality" that existed in his case, as well as his being 14 years old at the time of the offense and having an IQ that placed him in the range for a diagnosis of mental retardation. In contrast, the State argued it believed "the nature and circumstances of these offenses do reflect irreparable corruption on the part of the defendant." The State emphasized the crimes were violent and random and the victims were innocent and elderly. The State maintained "[a] five-year[-]old would know how wrong this was." The State pointed also to the incidents in the juvenile detention center.

¶ 51 The trial court stated the following before denying the motion to reconsider:

"Of course, the Court is very familiar with this case. This was an original 2009 case. It was tried once. Then it did come back to be tried again in this matter. And I was the trial judge on it. I remember the facts and circumstances very well.

This was a random attack on two individuals. They were innocent people. One was beaten to death. The other one was nearly beaten to death in this case.

[The] Court did consider statutory factors of aggravation and mitigation, including the defendant's age, diminished mental capacity, and characteristics of youth.

\*\*\*

- 13 -

The Court is familiar with the *Buffer* case in this matter.

But given the facts and circumstances that the Court has in front of it, I do find that there is irreparable corruption in this case with the beatings that were done to the two individuals in this matter.

Given there was no remorse shown certainly at the time, I do not feel that—even with the change in law—that it is appropriate that the defendant be granted a new sentencing hearing in this matter."

¶ 52    This appeal followed.

¶ 53                                  II. ANALYSIS

¶ 54    We note defendant, in his appellant brief, challenges his sentence first and then asserts challenges to his convictions. A ruling in defendant's favor on the issues relevant to his convictions would render unnecessary any ruling on the sentencing issues. We therefore begin with defendant's arguments challenging his convictions.

¶ 55                          A. Assistance of Counsel

¶ 56    Defendant argues he was denied the effective assistance of counsel because counsel failed to impeach the State's key witnesses with prior inconsistent testimony or criminal behavior.

¶ 57    To prevail on his ineffective-assistance-of-counsel claim, defendant must establish counsel's performance was deficient and that deficient performance prejudiced him. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 39, 115 N.E.3d 982. To meet the first part of this test, defendant must prove his counsel's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing

*Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A strong presumption exists the challenged act or omission was the product of sound trial strategy and not incompetence. *People. v. Haynes*, 192 Ill. 2d 437, 473, 737 N.E.2d 169, 189 (2000); see also *Peel*, 2018 IL App (4th) 160100, ¶ 39 ("Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective."). Defendant may overcome that presumption, however, if he shows counsel's strategic choice "appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. King*, 316 Ill. App. 3d 901, 916, 738 N.E.2d 556, 568 (2000).

¶ 58                              1. *Martin Wheeler*

¶ 59           Defendant contends Wheeler's testimony at the second trial was inconsistent with his testimony at the first trial and counsel improperly failed to call this inconsistency to the jury's attention. According to defendant, Wheeler's testimony at the second trial was that he did not remember who first hit Newingham. However, at the second trial, Wheeler initially testified Murphy hit Newingham first but contradicted himself by testifying defendant hit him first. In addition, according to defendant, Wheeler admitted he told police officers Murphy jumped on Newingham's head and he did not identify defendant as doing the same, whereas at trial, Wheeler testified defendant stomped on Newingham's head.

¶ 60           The State asserts the decision not to revisit these matters was a matter of trial strategy. The State emphasizes defense counsel, instead of choosing to go over how defendant beat Newingham to reinforce those matters for the jury, chose to undermine Wheeler's testimony on direct examination by inquiring as to Wheeler's ability to observe defendant's actions.

¶ 61           We agree with the State and find the decision not to cross-examine further on the discrepancies in Wheeler's reporting of the attacks to be strategic. Wheeler's testimony

- 15 -

established he had twice reported defendant was involved in attacking Newingham. The jury learned in those two reports Wheeler's reporting of the events had changed on the issue of who first struck Newingham. He was, however, consistent with reporting defendant attacked Newingham. There was little probative value to hear that Wheeler's identification as the first to strike was different a second time when the jury would then also hear Wheeler attest, for a third time, defendant was one of Newingham's attackers. In addition, Wheeler already established the inconsistency in his testimony and established he was 15 to 20 feet away from both attacks when multiple individuals were involved and a number of other people were in the area. We further find strategic the failure to impeach Wheeler with the fact he initially did not reveal defendant as one who jumped on Newingham. There was little, if any, probative value in this suggested impeachment as the testimony does not show a contradiction, but an omission. To cross-examine on this matter would have given Wheeler one more opportunity to affirm defendant stomped on Newingham with little to gain from that same testimony. The decision not to pursue these questions was not unreasonable.

¶ 62                                    2. *Malcolm Spence*

¶ 63            Defendant contends trial counsel was ineffective for failing to impeach Spence with his juvenile adjudication for the Class X felony of home invasion. Defendant argues there was no legitimate trial strategy to forgo impeaching Spence with this evidence.

¶ 64            The State contends the jury heard Spence testify he had multiple convictions and charges and, therefore, the failure to have Spence affirm his juvenile conviction did not prejudice defendant. We agree with the State.

¶ 65            At trial, Spence testified he was convicted of theft and residential burglary in April 2007. He further admitted, in relation to the beatings of Newingham and Wilson, he had

- 16 -

been charged with first degree murder, aggravated battery, and robbery, but he pled guilty to mob action and obstruction of justice in June 2011 and agreed to testify in exchange. Spence admitted being arrested in February 2017 for domestic battery but stated no charges were filed in that case. Spence further agreed he was, at that time, serving a sentence in the Macon County jail, with an additional 30 months' probation, for possession of a controlled substance and aggravated fleeing.

¶ 66　　　　　The jury was well-informed of Spence's criminal history. There is no reasonable probability the outcome of defendant's trial would have been affected had the jury also heard Spence had a juvenile conviction for home invasion.

¶ 67　　　　　　　　　　　　　　B. Closing Argument

¶ 68　　　　　Defendant argues the prosecutor made inflammatory and improper remarks during closing argument that denied him his right to a fair trial. Defendant contends the prosecutor improperly created an " 'us-against-them' " atmosphere by asking the jury to put themselves in Wilson's shoes and telling the jury no innocent person would have blood on the bottom of their shoes. Defendant further points to the following statement made at the end of closing argument:

> "Nine years has passed since these two innocent men were
> attacked and one of them was killed. Justice in this case has been
> delayed. And we're asking you today that you not let it be denied.
> Please find this defendant guilty and hold him accountable for the
> actions that he took and the conscious choices that he made on
> August the 24th of 2009, by finding him guilty. Thank you."

Defendant contends the " 'delay' " was due to decisions regarding the prosecution of Murphy

and defendant and the " 'justice was delayed' " argument was irrelevant to the jury's task. Defendant acknowledges he forfeited this argument by not raising it below but urges this court to find plain error.

¶ 69        As defendant acknowledges, his challenge to the propriety of the prosecutor's comments was not raised before the trial court and is therefore forfeited. *People v. Ngo*, 388 Ill. App. 3d 1048, 1054, 904 N.E.2d 98, 104 (2008). An otherwise forfeited argument may be reviewed under the plain-error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479-80 (2005). The first question in determining whether the doctrine applies is whether plain error occurred. *People v. Nicholas*, 218 Ill. 2d 104, 121, 842 N.E.2d 674, 684 (2006). The defendant carries the burden of establishing it has. See *People v. Birge*, 2021 IL 125644, ¶ 24, 182 N.E.3d 608. Once clear error is established, review of an unpreserved error is permissible when either the evidence is closely balanced or the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. *Nicholas*, 218 Ill. 2d at 120-21.

¶ 70        In our plain-error analysis, we thus begin with the question of whether the prosecutor committed clear error during argument. In closing argument, prosecutors are afforded wide latitude. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47, 115 N.E.3d 270. Prosecutors may comment on the evidence and argue reasonable inferences from the facts. *Ngo*, 388 Ill. App. 3d at 1054. A prosecutor may " 'discuss subjects of general knowledge, common experience, or common sense in closing argument.' " *Id.* at 1055 (quoting *People v. Beard*, 356 Ill. App. 3d 236, 242, 825 N.E.2d 353, 359 (2005)). A prosecutor may also "comment unfavorably on the defendant, the violence of the crime, and the benefits of the fearless administration of the law." *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 54, 36 N.E.3d 918 (citing *People v. Hope*, 116 Ill.

2d 265, 277-78, 508 N.E.2d 202, 207-08 (1986)); see also *Nicholas*, 218 Ill. 2d at 121-22 ("[A] prosecutor may *** urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence."); *People v. Beler*, 327 Ill. App. 3d 829, 836, 763 N.E.2d 925, 930 (2002) (finding no error in the prosecutor's urging of the jury to " 'do[ ] the right thing' " and find defendant guilty). However, "comments intending only to arouse the prejudice and passion of the jury are improper." *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21, 69 N.E.3d 226.

¶ 71        Defendant has not met his burden of establishing plain error occurred. As to defendant's first contention, regarding the argument no innocent person like the jurors would have blood on the bottom of their shoes, that argument reflects evidence of blood on defendant's shoes and asks the jury to use its common sense. Such an argument is permissible. See *Ngo*, 388 Ill. App. 3d at 1055. Regarding his second argument, referencing the passage of "[n]ine years" and the delay in justice, we find defendant has not established clear error. The passage of nine years was established by the evidence. The prosecutor did not attribute the delay to anyone. Prosecutors may ask the jury for justice. See *Beler*, 327 Ill. App. 3d at 836. Defendant cites no case law to establish the passage of time somehow mitigates the prosecutor's authority to ask a jury to seek justice. We find no clear error has been established.

¶ 72        In the alternative to his plain-error analysis, defendant seeks reversal based on the argument his counsel provided ineffective assistance by not objecting to the prosecutor's improper comments. This argument fails. Defendant failed to establish the prosecutor's remarks were improper. Without proof the remarks were improper, defendant cannot prevail under either *Strickland* prong.

¶ 73                                C. Sentencing

- 19 -

¶ 74          1. *Constitutionality of Defendant's de facto Life Sentence*

¶ 75          Defendant argues his 45-year *de facto* life sentence is unconstitutional as the trial court erred in finding him permanently incorrigible. Defendant argues the trial court did not base its decision on proper consideration of the factors relevant to the issue of his potential for rehabilitation and instead relied on the brutality of the crime itself and his earlier lack of remorse.

¶ 76          a. Forfeiture

¶ 77          In his opening brief, defendant concedes the issue was not raised in a posttrial motion and asks the court to consider the matter as plain error. In his reply brief, however, defendant argues that concession was inadvertent and maintains he did in fact raise the issue in his posttrial motion. In his amended motion to reconsider sentence, defendant expressly argued his offense did not reflect "irreparable corruption" and his 45-year sentence, a *de facto* life sentence, is excessive under *Montgomery v. Louisiana*, 577 U.S. 190, 208, 136 S. Ct. 718, 734 (2016). Defendant had properly preserved the error for our review.

¶ 78          The question arises, however, whether defendant waived or forfeited this argument by conceding the forfeiture issue in his opening brief. Under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), points not argued in the appellant brief are forfeited and may not be raised in the reply brief. Rule 341(h)(7) is, however, an admonishment to the parties; the rule does not limit the jurisdiction of this court. *People v. Donoho*, 204 Ill. 2d 159, 169, 788 N.E.2d 707, 714 (2003).

¶ 79          Here, the State will not suffer undue prejudice if this court forgives the forfeiture and addresses defendant's claim. In his brief, defendant, after incorrectly conceding the issue was not raised in the trial court, asked this court to review the matter as plain error. In addressing defendant's claim plain error occurred, the State argued in its brief the trial court's ruling finding

defendant permanently incorrigible was based on proper factors and supported by the evidence—the question we are asked to resolve here.

¶ 80        We turn to the merits of defendant's claim.

¶ 81                        b. Defendant's Substantive Claim

¶ 82        Our review of *de facto* life sentences for juveniles has been marked by a gradual evolution of what a trial court must consider. In the "most recent decisions involving the constitutional limitations of juvenile life sentences, both the United States Supreme Court and Illinois Supreme Court have reiterated that a juvenile offender may receive a life sentence provided procedural safeguards are in place to ensure that the offender's youth is part of the sentencing consideration." *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 78 (citing *Jones v. Mississippi*, 593 U.S. __, __, 141 S. Ct. 1307, 1318 (2021), and *People v. Dorsey*, 2021 IL 123010, ¶ 40, 183 N.E.3d 715). When the sentencing court considers a defendant's youth and its attendant circumstances, that court may sentence a juvenile offender to a sentence greater than 40 years. *Id.* ¶ 79.

¶ 83        When the trial court initially imposed the sentence, the court noted it considered the statutory factors in aggravation and mitigation. The court stated defendant's age and pointed to his mental deficiencies and acknowledged evidence defendant's actions were influenced by his brother. The court further noted defendant apologized and received his GED. In the best of all possible worlds, it might be preferable for a sentencing court to comment more specifically on defendant's age, size, developmental disability, year in school, and peer pressure. While that may be preferable, *Jones* does not require the court to make a finding of permanent incorrigibility (see *Jones*, 593 U.S. at __, 141 S. Ct. at 1321-22), nor is the court required to establish it considered the defendant's youth. The court here emphasized the attack was random and involved two

innocent people. The court stated it considered the aggravating and mitigating factors, including defendant's youth and diminished capacity. It did so at the original sentencing hearing and the hearing on resentencing. This was sufficient to defeat defendant's claim.

¶ 84                                    2. *Effectiveness of Counsel*

¶ 85        Defendant last argues he was denied the effective assistance of counsel at sentencing as counsel failed to introduce the following mitigating evidence: (1) a psychological evaluation used in defendant's 2014 discretionary-transfer hearing and (2) the testimony of the evaluator, Lawrence Jeckel, M.D., at that hearing. Defendant contends Dr. Jeckel concluded, in 2009, defendant suffered "Disruptive Behavior Disorder, NOS and Learning Disorder, NOS" but later found defendant's behavior improved over those five years and defendant had matured. Defendant acknowledges Dr. Jeckel remarked defendant may have an untreatable personality disorder but emphasizes Dr. Jeckel testified individuals have aged out of that disorder in their forties and fifties. Defendant further emphasizes the finding in the evaluation Dr. Jeckel had not "directly observe[d] any lack of remorse or guilt[ ] [or] callous lack of empathy," creating a reasonable probability the sentencing court would not have found defendant's lack of remorse at the time of the offense suggestive of irreparable corruption.

¶ 86        Defendant has not overcome the strong presumption the omission of the above evidence by sentencing counsel was the product of sound trial strategy. See *Haynes*, 192 Ill. 2d at 473. Dr. Jeckel's opinion report and testimony contain opinions that are damaging to defendant's contention his youth and psychological circumstances support a lesser sentence. Despite, as defendant contends, the report's conclusion Dr. Jeckel "did not directly observe any lack of remorse," Dr. Jeckel testified at the hearing, "I just didn't hear a lot of remorse *** you know it wasn't prominent ***." While the report shows Dr. Jeckel concluded defendant "appears

- 22 -

[to] have matured," Dr. Jeckel, after being asked if his opinion would change if he learned defendant physically attacked another inmate two weeks after the report was written, testified "that would be an indicator of possibly persistent personality disorder." Dr. Jeckel stated if defendant had a persistent personality disorder, "the odds are it's hard to treat personality disorders." His acknowledgment that some people in their forties and beyond can be cured of an antisocial personality disorder supports a lengthy sentence. The report further indicates Dr. Jeckel could not "predict whether [defendant] will regress to angry, primitive behaviors if *** released into the community."

¶ 87     As defendant has not overcome the presumption sentencing counsel's omission of Dr. Jeckel's report and testimony was a matter of trial strategy, he has not shown he was denied the effective assistance of counsel at sentencing.

¶ 88                                III. CONCLUSION

¶ 89     We affirm defendant's convictions and sentence.

¶ 90     Affirmed.